**IN THE UNITED STATES DISTRIC COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| TEXAS DEMOCRATIC PARTY; DSCC; and DCCC, | |
| *Plaintiffs*, | |
| v. | CIVIL ACTION NO. 5:20-cv-00008-OLG |
| RUTH R. HUGHS, in her official capacity as the Texas Secretary of State, | |
| *Defendant*. | |

**THE TEXAS SECRETARY OF STATE'S MOTION TO DISMISS**

### TABLE OF CONTENTS

Table of Contents ...........................................................................................................................ii

Introduction.....................................................................................................................................1

Argument .........................................................................................................................................1

I.      The Secretary Is Not a Proper Defendant................................................................................1

        A.      Sovereign Immunity Bars Plaintiffs' Claims .............................................................1

        B.      Plaintiffs Lack Article III Standing to Sue the Secretary .........................................5

II.     Plaintiffs Do Not Have Standing to Challenge Section 13.002.............................................6

        A.      Plaintiffs Lack Associational Standing Because They Have Not Identified
                Injured Members .........................................................................................................7

        B.      Plaintiffs Do Not Have Organizational Standing Because They Are Not
                Injured .........................................................................................................................8

        C.      Plaintiffs Cannot Show Statutory Standing Because Artificial Entities Do Not
                Have Voting Rights....................................................................................................12

III.    Plaintiffs Cannot Sue under the Civil Rights Act ...............................................................13

IV.     Section 13.002 Is Constitutional .........................................................................................16

        A.      Section 13.002 Is Justified under *Anderson-Burdick* .............................................16

        B.      The Signature Requirement Is Not Discriminatory ..................................................18

V.      Plaintiffs Cannot Bring a State-Law Claim .........................................................................19

Conclusion .....................................................................................................................................20

**INTRODUCTION**

The Texas Democratic Party, Democratic Senatorial Campaign Committee, and Democratic Congressional Campaign Committee ("Plaintiffs") complain that local officials have rejected voter registration applications submitted by third parties due to the lack of a proper signature. Those officials did so pursuant to the Texas Election Code's signature requirement. *See* Tex. Elec. Code § 13.002. Plaintiffs' complaint suffers from fundamental jurisdictional defects. First, Plaintiffs sued the Texas Secretary of State, even though she does not implement or enforce Section 13.002. Second, Plaintiffs have not plausibly alleged any certainly impending injury in fact that could support standing to seek prospective relief against the enforcement of Section 13.002.

Moreover, each of Plaintiffs' claims fails individually. Plaintiffs cannot prevail on Count I because they do not have a private cause of action. Counts II and III should be dismissed because Section 13.002 is constitutional. It imposes, at most, a minimal burden on voters but advances weighty state interests in protecting the franchise. Finally, Count IV—an effort to impose Plaintiffs' interpretation of Section 13.002—is barred by sovereign immunity.

For the reasons explained below, the Secretary respectfully requests that the Court dismiss Plaintiffs' claims. *See* Fed. R. Civ. P. 12(b)(1), (6).

**ARGUMENT**

## I.     The Secretary Is Not a Proper Defendant

Plaintiffs' suit against the Secretary fails because she does not enforce Section 13.002. Local registrars approve or reject registration applications under the standards set out in the Texas Election Code. The Secretary nether handles applications herself nor controls the local officials who do. As a result, *Ex parte Young* does not apply, and Plaintiffs lack standing to sue the Secretary.

### A.     Sovereign Immunity Bars Plaintiffs' Claims

Sovereign immunity precludes claims against state officials unless the *Ex parte Young* exception

applies. *See McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 412 (5th Cir. 2004). *Ex parte Young* "rests on the premise—less delicately called a 'fiction'—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes. The doctrine is limited to that precise situation . . . ." *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (citation omitted).

As a consequence, *Ex parte Young* applies only when the defendant enforces the challenged statute. *See Ex parte Young*, 209 U.S. 123, 157 (1908) ("[I]t is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party."); *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) ("The required connection is not merely the general duty to see that the laws of the state are implemented, but the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." (quotation omitted)).

As the Fifth Circuit recently explained, even when a government official "has the authority to enforce" a challenged rule, a plaintiff still must show the official "is likely to do [so] here." *City of Austin v. Paxton*, 943 F.3d 993, 1001–02 (5th Cir. 2019). Without evidence of likely enforcement, the government official "lacks the requisite connection to the enforcement of" the challenged law. *Id.* at 1002 (quotations omitted).

Texas law designates the local voter registrar, not the Secretary, as the official responsible for approving or rejecting applications: "The registrar shall review each submitted application for registration to determine whether it complies with Section 13.002 and indicates that the applicant is eligible for registration." TEX. ELEC. CODE § 13.071. Indeed, Plaintiffs concede as much by focusing their complaint on whether *county officials* "would process and accept registration applications." Compl. ¶ 19 (discussing "the Travis County registrar"); *see also id* ¶ 3 (noting applications must be transmitted "to the county registrar"); *id.* ¶ 20 (complaining about "how the county registrars determined whether

an application complied with the wet signature rule").

Plaintiffs identify no enforcement actions taken by the Secretary. They assert that the Secretary "instructed county registrars to reject" certain applications, but their citations belie their claim. Compl. ¶ 1. First, they point to a press release. *Id.* at 1 n.1. But the press release did not instruct local officials to do anything. Indeed, it was not even directed to local officials. Instead, it warned voters that they "should be extremely cautious when handing over personal and sensitive information to any unknown third party." It emphasized that the Secretary "is committed to ensuring all Texans understand proper and legal procedures for registering to vote" and pointed voters to the Secretary's official website. The only reference to signatures emphasized that the Secretary had not vetted and authorized any particular website: "Any web site that misleadingly claims to assist voters in registering to vote online by simply submitting a digital signature is not authorized to do so." That is a statement of fact, not an order to local officials, because "online voter registration is not available in the State of Texas."[1]

Second, Plaintiffs cite online articles paraphrasing an employee of the Secretary of State, Compl. at 1 n.1, ¶ 18. Even if that were enough to plausibly allege that the employee shared an opinion with a reporter, it would not be enough to plausibly allege that the Secretary ordered local officials to reject applications.

Even if the Secretary had issued a directive to local officials, it would not have bound them. The Secretary does not control registrars' application decisions. She cannot coerce local officials into following Section 13.002. Plaintiffs so acknowledge by alleging that the Travis County registrar initially decided to accept the relevant applications on the advice of his own "legal counsel." Compl. ¶ 19. That was "after the Secretary" supposedly "announced the wet signature rule." *Id.* Clearly, Travis

---

[1] Press Release, Texas Secretary of State, Secretary Pablos Reminds Texans To Exercise Caution When Registering To Vote (Oct. 4, 2018), https://www.sos.texas.gov/about/newsreleases/2018/100418.shtml.

County officials did not think the Secretary could require them to process applications in a particular way. To be sure, the Travis County registrar later decided to reject the applications, but Plaintiffs do not allege that the Secretary coerced him into doing so. *Id.*

Plaintiffs point to the Secretary's duties under the Election Code, but none of them allows her to coerce local officials regarding registration applications, much less handle applications herself. First, Plaintiffs highlight the Secretary's role as "chief election officer," *id.* at ¶ 15, but that title is not "a delegation of authority to care for any breakdown in the election process." *Bullock v. Calvert*, 480 S.W.2d 367, 372 (Tex. 1972) (narrowly interpreting "chief election officer"). Second, Plaintiffs emphasize the Election Code provision for "obtain[ing] and maintain[ing] uniformity." Compl. ¶ 15. But that establishes the Secretary's goal, not the powers she has to reach it. Third, Plaintiffs note the Secretary's role in "implement[ing] and maintain[ing] a statewide computerized voter registration list." *Id.* (quoting Tex. Elec. Code § 18.061(a)). But that database reflects voter registration decisions made by local officials, not the Secretary's independent assessment of registration applications. *See* Tex. Elec. Code § 18.061(c).

Last, Plaintiffs point to the Secretary's duties to (1) "prepare detailed and comprehensive written directives and instructions" regarding election laws (2) "distribute these materials to the appropriate state and local authorities having duties in the administration of these laws," and (3) "assist and advise all election authorities with regard to the application, operation, and interpretation of" election laws. Compl. ¶ 15 (quoting Tex. Elec. Code § 31.003, .004(a)). None of these duties allows the Secretary to enforce Section 13.002 herself or coerce local officials into doing so.

But even if she could, a federal court could not order her to exercise such a power. The *Ex parte Young* exception is limited to prohibitory injunctions "prevent[ing] [a state official] from doing that which he has no legal right to do." *Ex parte Young*, 209 U.S. at 159. It does not authorize mandatory injunctions directing "affirmative action." *Id.*; *see also Larson v. Domestic & Foreign Commerce Corp.*, 337

U.S. 682, 691 n.11 (1949) ("Of course, a suit may fail, as one against the sovereign, even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statutory powers, if the relief requested cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign or the disposition of unquestionably sovereign property."). Thus, sovereign immunity bars "cases where the [defendant] sued could satisfy the court decree only by acting in an official capacity." *Zapata v. Smith*, 437 F.2d 1024, 1026 (5th Cir. 1971).

### B.  Plaintiffs Lack Article III Standing to Sue the Secretary

Plaintiffs cannot establish standing to sue the Secretary because her actions do not cause their alleged injuries. Whether a registration application is accepted or rejected depends on the actions of local officials, not the Secretary of State. Thus, Plaintiffs' asserted injuries are not "fairly traceable to the challenged action of the defendant"; they are "the result of the independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quotation and alterations omitted).

Plaintiffs' argument that a *statute or rule* causes their injuries is irrelevant to the question at hand: whether *the Secretary* causes Plaintiffs' injuries. *See Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001) (en banc) (dismissing for lack of standing and explaining that courts should not "confuse[] the statute's immediate coercive effect on the plaintiffs with any coercive effect that might be applied by the defendants").

For similar reasons, Plaintiffs' purported injuries are not redressable. Relief against the Secretary would not accomplish anything. Plaintiffs request a court order (1) "enjoining the Secretary . . . from implementing, enforcing, or giving any effect to the wet signature rule," (2) "enjoining Defendant from rejecting voter registration applications for lack of a wet-ink signature," and (3) "requiring Defendant to permit voters whose voter registration applications were previously rejected for lack of a wet signature to resubmit their applications." Compl. at 17. None of those

injunctions would meaningfully change the status quo. The Secretary does not implement, enforce, or give effect to the supposed rule. The Secretary does not reject registration applications. And she does not forbid voters from submitting (or resubmitting) applications.

For one of their requested injunctions, Plaintiffs propose to include "all persons acting in concert with" the Secretary, "including all county voter registrars." Compl. at 17. As an initial matter, local officials are not "in active concert or participation with" the Secretary. Fed. R. Civ. P. 65(d)(2). They are elected or appointed locally and are not "subject to [the Secretary's] control." *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945). Regardless, a plaintiff cannot use non-parties within the scope of Rule 65 to satisfy standing requirements. *See Lujan*, 504 U.S. at 560 (requiring traceability to "the defendant"); *Okpalobi*, 244 F.3d at 427 (finding no standing "[b]ecause these defendants have no powers to redress the injuries alleged").[2]

## II.   Plaintiffs Do Not Have Standing to Challenge Section 13.002

Because Plaintiffs seek prospective relief, they must establish an "imminent" future injury. *Lujan*, 504 U.S. at 564. The Supreme Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quotation omitted). Allegations of "an imminent injury" must be "[p]laintiff-specific." *Stringer v. Whitley*, 942 F.3d 715, 722 (5th Cir. 2019). "[F]uture injury to others is irrelevant; plaintiffs seeking

---

[2] *OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017), is not to the contrary. Although the court found the Secretary to be a proper defendant in that case, its reasoning does not apply here. First, sovereign immunity had been abrogated, *see id.* at 614, so *OCA-Greater Houston* does not affect the Secretary's *Ex parte Young* argument in this case. *See supra* Part I.A. Second, *OCA-Greater Houston* distinguished *Okpalobi* on the ground that *Okpalobi* involved a private right of action. *See OCA-Greater Hous.*, 867 F.3d at 613. This case involves a private right of action too. Section 13.002 regulates the actions of local officials. Although the Secretary cannot enforce that provision against local officials, a losing candidate may be able to enforce it through an election contest. *See* Tex. Elec. Code §§ 221.003(a), 232.002. In any event, the extent of the Secretary's power must be determined on a case-by-case basis. As a result, *OCA-Greater Houston*'s ruling on that issue cannot extend beyond the record and briefing before that court.

injunctive relief must show a continuing or threatened future injury to themselves." *Id.* at 721.

A.     **Plaintiffs Lack Associational Standing Because They Have Not Identified Injured Members**

A plaintiff cannot have associational standing unless one of its members would have standing to sue individually. *See Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 536 (5th Cir. 2019). Thus, Plaintiffs must "identify members who have suffered the requisite harm" to establish injury in fact. *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009); *see also NAACP v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010) (requiring evidence of "a specific member").

Because Plaintiffs have not alleged the existence of specific members, let alone specific members with individual standing, their claims should be dismissed. *See Ga. Republican Party v. SEC*, 888 F.3d 1198, 1203 (11th Cir. 2018) (holding that the Georgia Republican Party lacked associational standing because it "has failed to allege that a specific member will be injured by the rule, and it certainly offers no evidence to support such an allegation"); *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (dismissing under Rule 12(b)(1) because plaintiff did not identify a member who was affected by the challenged regulation); *Disability Rights Wis., Inc. v. Walworth Cty. Bd. of Supervisors*, 522 F.3d 796, 804 (7th Cir. 2008) (concluding a plaintiff "has not established associational standing" because its "Complaint does not identify any Walworth County disabled student with standing to bring suit").

The DSCC and the DCCC do not describe themselves as membership organizations. Compl. ¶¶ 11–14. Not having members is fatal to associational standing. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977) (requiring "indicia of membership in an organization" for associational standing); *City of Olmsted Falls v. FAA*, 292 F.3d 261, 267–68 (D.C. Cir. 2002) (holding a city could not assert associational standing because it did not have members).

TDP claims to have "members and constituents . . . including Texans who regularly support candidates affiliated with the Democratic Party," Compl. ¶ 8, but that is insufficient. Plaintiffs have not alleged that TDP's "members elect leadership, serve as the organization's leadership, and finance

the organization's activities, including the case's litigation costs." *Tex. Indigenous Council v. Simpkins*, No. 5:11-cv-315, 2014 WL 252024, at *3 (W.D. Tex. Jan. 22, 2014) (quoting *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 344 n.9 (5th Cir. 2012)); *see also Ass'n for Retarded Citizens of Dall. v. Dall. Cty. Mental Health & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir. 1994).

Plaintiffs may work on behalf of individual candidates, but beneficiaries of a plaintiff's services do not qualify as members for associational standing. *See Ne. Ohio Coal. for Homeless v. Blackwell*, 467 F.3d 999, 1010 n.4 (6th Cir. 2006) ("[T]he Northeast Ohio Coalition for the Homeless apparently seeks to assert a form of representational standing never recognized by any court—standing on behalf of the group served by the organization."); *id.* at 1013 (McKeague, J., concurring).

Absent plausible allegations that Section 13.002 will lead to the rejection of registration applications from identified members, Plaintiffs cannot establish associational standing.

## B. Plaintiffs Do Not Have Organizational Standing Because They Are Not Injured

An organization lacks organizational standing unless it satisfies the same Article III requirements applicable to individuals: injury in fact, causation, and redressability. *See City of Kyle*, 626 F.3d at 237 (citing *Lujan*, 504 U.S. at 560–61). In an appropriate case, an organization can establish an injury in fact by showing that the challenged law conflicts with the organization's mission and "perceptibly impair[s]" its activities. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

If an organization avoids the impairment of its activities by spending additional resources to combat the effects of the challenged law, then the "drain on the organization's resources" may constitute an injury in fact. *Id.*; *see City of Kyle*, 626 F.3d at 238. But if the alleged effect of the challenged law on the plaintiff's activities would not qualify as an injury in fact, the plaintiff's reaction to the challenged law cannot qualify either. *See Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 379 (D.C. Cir. 2017) ("[A]ny resources [the organizational plaintiff] used to counteract the lack of a privacy impact assessment—an assessment in which it has no cognizable

interest—were a self-inflicted budgetary choice that cannot qualify as an injury in fact." (quotation omitted)). That is because a plaintiff "cannot manufacture standing by choosing to make expenditures based on" an alleged harm that does not itself qualify as an injury in fact. *Clapper*, 568 U.S. at 402.

Here, Plaintiffs fail on both theories. They have not plausibly alleged that Section 13.002 causes them cognizable injuries in fact. And their reactions to Section 13.002 do not qualify either.

### 1. Plaintiffs have not Plausibly Alleged Impairment of Their Activities or Direct Conflict with Their Missions

To establish standing under an impairment theory, Plaintiffs must plausibly allege both that Section 13.002 makes their "*activities* more difficult" and that there is "a direct conflict between the defendant's conduct and [their] *mission*." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996); *see also id.* at 1429 (requiring that the "action challenged" be "at loggerheads with the [plaintiff's] stated mission"). Plaintiffs have not done so here. As a result, "it is entirely speculative whether the defendant's conduct is impeding the organization's activities." *Id.* at 1430.

Plaintiffs do not allege that Section 13.002 prohibits their activities. Nor could they. The statute does not prohibit "supporting Democratic Party candidates," helping voters, or "campaign[ing] to boost voter turnout." Compl. ¶¶ 8, 11, 13. Plaintiffs are free to engage in such activities.

Recognizing this, Plaintiffs instead rely on the contention that Section 13.002 "limit[s] the effectiveness of" their activities and "make[s] it more difficult" to "accomplish [their] mission of electing Democrats." Compl. ¶ 10; *accord id.* ¶¶ 11, 14. But there is no "direct conflict" between Section 13.002 and Plaintiffs' mission. *Nat'l Treasury Emps. Union*, 101 F.3d at 1430.

In *National Treasury Employees Union*, a public-sector union wanted to challenge the Line Item Veto Act. But the union's "mission [wa]s to obtain improved worker conditions—a mission not necessarily inconsistent with the Line Item Veto Act." *Id.* Thus, the union rested its standing on the possibility the President would use his line-item veto authority to affect benefits for government workers. The court found no standing: "For a myriad of reasons, a given President may be disinclined

to exercise the item veto power as to government employee benefits." *Id.* Such a speculative possibility could not be an injury in fact. *See Clapper*, 568 U.S. at 409.

So too here. Section 13.002 is not in "direct conflict" with Plaintiffs' mission of electing Democrats. It is not even in indirect conflict. Plaintiffs do not allege that any Democratic voters are unable to register. Nor do they allege that registration is more difficult for Democratic voters than other voters. Indeed, Plaintiffs conspicuously fail to allege that Section 13.002 will cause any Democratic candidate to lose a race the candidate otherwise would have won. Thus, Plaintiffs cannot establish that the statute impairs their organizational activities or directly conflicts with their mission.

### 2.     Plaintiffs Cannot Establish Standing Based on Diversion of Resources

Plaintiffs cannot claim standing based on a diversion of resources. Compl. ¶ 10–11, 14. The alleged effects of Section 13.002 on Plaintiffs' activities are not injuries in fact, so Plaintiffs' reactions are not either. As discussed above, a plaintiff "cannot manufacture standing by choosing to make expenditures based on" an alleged harm that is not itself an injury in fact. *Clapper*, 568 U.S. at 402.

That general principle applies with equal force to organizational standing. In *National Treasury Employees Union*, because the possibility that the President would line-item veto benefits for government workers was not an injury in fact, the union's reaction to that possibility was also not an injury in fact. "Absent a direct conflict between [the union's] mission and the Line Item Veto Act, we are unsure whether [the union's] additional expenditure of funds is truly necessary to improve the working conditions of government workers or rather is unnecessary alarmism constituting a self-inflicted injury." *Nat'l Treasury Emps. Union*, 101 F.3d at 1430.

The same reasoning applies here. Because there is no "direct conflict" between Section 13.002 and Plaintiffs' mission, Plaintiffs seem to base their claim to organizational standing on the speculative possibility that Section 13.002 will cause a Democratic candidate to lose an election. *See* Compl. ¶ 11 (alleging that the DSCC must divert resources "to support its mission" and that its mission is "electing

10

the Democratic Party candidate"). But as noted above, Plaintiffs do not allege any facts to support this speculation. They do not even allege they will lose any particular race as a result of Section 13.002. Thus, they cannot establish that their "additional expenditure of funds is truly necessary" for their mission rather than "unnecessary alarmism constituting a self-inflicted injury." *Nat'l Treasury Emps. Union*, 101 F.3d at 1430.

Moreover, there are additional reasons Plaintiffs' expenditures cannot support standing. "Not every diversion of resources to counteract [a] defendant's conduct . . . establishes an injury in fact." *City of Kyle*, 626 F.3d at 238. To establish standing, "an organizational plaintiff must explain how the activities it undertakes in response to the defendant's conduct differ from its 'routine [] activities,'" and must "identify 'specific projects that [it] had to put on hold or otherwise curtail in order to respond to' the defendant's conduct." *Def. Distributed v. U.S. Dep't of State*, No. 1:15-cv-372, 2018 WL 3614221, at *4 (W.D. Tex. July 27, 2018) (quoting *City of Kyle*, 626 F.3d at 238).

Plaintiffs cannot satisfy either requirement. First, their alleged reactions to Section 13.002 do not meaningfully differ from their "day-to-day operations." *ACORN v. Fowler*, 178 F.3d 350, 358 (5th Cir. 1999). Plaintiffs' only alleged reactions to Section 13.002 are to support Democratic candidates, which is what they always do. Compl. ¶ 10 ("to assist voters in completing the registration process and increase turnout"); *id.* ¶ 11 ("to ensure that eligible citizens are registered to vote"); *id.* ¶ 14 ("to accomplish its goal of significantly increasing voter registration and turnout in Texas"). "Plaintiffs have not explained how" their reactions "differ from [their] routine [political] activities." *City of Kyle*, 626 F.3d at 238.

Second, Plaintiffs "have not identified any specific projects that [they] had to put on hold or otherwise curtail in order to respond to" Section 13.002. *City of Kyle*, 626 F.3d at 238. Vague references to "other critical priorities" and "efforts" or "programs in other states" do not suffice. Compl. ¶ 10–11, 14.

**C.      Plaintiffs Cannot Show Statutory Standing Because Artificial Entities Do Not Have Voting Rights**

Even if Plaintiffs had Article III standing, they would lack statutory standing. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014) (explaining statutory standing). Section 1983 provides a cause of action only when *the plaintiff* suffers "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. It does not provide a cause of action to plaintiffs claiming an injury based on the violation of a *third party's* rights. *See Coon v. Ledbetter*, 780 F.2d 1158, 1160 (5th Cir. 1986) ("[L]ike all persons who claim a deprivation of constitutional rights, [plaintiffs] were required to prove some violation of their personal rights.").

Section 1983 "incorporates, but without exceptions, the Court's 'prudential' principle that the plaintiff may not assert the rights of third parties." David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41, 45. When "[t]he alleged rights at issue" belong to a third party, rather than the plaintiff, the plaintiff lacks statutory standing, regardless of whether the plaintiff has suffered his own injury. *Danos v. Jones*, 652 F.3d 577, 582 (5th Cir. 2011); *see also Conn v. Gabbert*, 526 U.S. 286, 292–93 (1999) (holding that a lawyer "clearly had no standing" to bring a § 1983 claim for an injury he suffered as a result of "the alleged infringement of the rights of his client" because a plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties").

Here, all of Plaintiffs' claims depend on the right to vote. Compl. ¶¶ 27, 32, 36, 42. But Plaintiffs are artificial entities without voting rights. "It goes without saying that political parties, although the principal players in the political process, do not have the right to vote." *Vieth v. Pennsylvania*, 188 F. Supp. 2d 532, 546 (M.D. Pa. 2002); *see also Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77, 91 (2d Cir. 2015).

Plaintiffs are necessarily asserting the rights of third parties and therefore cannot sue under § 1983. Because this follows from the statute itself, Plaintiffs cannot invoke any prudential exceptions.

*See Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) ("Because Congress specified in the statute who may sue, prudential standing principles do not apply."); *see also* Currie, 1981 Sup. Ct. Rev. at 45.

But even if Plaintiffs could invoke prudential-standing exceptions, their complaint does not do so. Plaintiffs do not allege that they have "a 'close' relationship with" voters, and there is no reason to think voters face any "hindrance" to protecting their "own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (noting the Supreme Court has generally "not looked favorably upon third-party standing").

## III.    Plaintiffs Cannot Sue under the Civil Rights Act

In Count I, Plaintiffs claim requiring a signature violates Section 1971 of the Civil Rights Act. Their claim should be dismissed because Congress did not give Plaintiffs a private cause of action. In any event, the Secretary has not violated the Civil Rights Act.

In Section 1971, Congress created a cause of action for the Attorney General, not private plaintiffs. *See* 52 U.S.C. § 10101(c) (providing "the Attorney General may institute for the United States, or in the name of the United States, a civil action or other proper proceeding for preventive relief"). Numerous courts have recognized that Section 1971 does not create an implied cause of action. *See, e.g., McKay v. Thompson*, 226 F.3d 752, 756 (6th Cir. 2000) ("Section 1971 is enforceable by the Attorney General, not by private citizens."); *Mixon v. State of Ohio*, 193 F.3d 389, 406 n.12 (6th Cir. 1999); *Gilmore v. Amityville Union Free Sch. Dist.*, 305 F. Supp. 2d 271, 279 (E.D.N.Y. 2004); *Spivey v. State of Ohio*, 999 F. Supp. 987, 996 (N.D. Ohio 1998); *McKay v. Altobello*, No. 2:96-cv-3458, 1996 WL 635987, at *2 (E.D. La. Oct. 31, 1996); *Cartagena v. Crew*, No. 1:96-cv-3399, 1996 WL 524394, at *3 n.8 (E.D.N.Y. Sept. 5, 1996); W*illing v. Lake Orion Cmty. Sch. Bd. of Trustees*, 924 F. Supp. 815, 820 (E.D. Mich. 1996); *Good v. Roy*, 459 F. Supp. 403, 405–06 (D. Kan. 1978).

This authority is in keeping with the modern approach to implied causes of action. In *Alexander*

*v. Sandoval*, 532 U.S. 275, 287 (2001), the Supreme Court rejected the looser approach to implying causes of action prevalent in the 1960s. Today, "private rights of action to enforce federal law must be created by Congress." *Id.* at 286. "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id.* Absent that intent, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Id.* at 286–87.

In this case, Section 1971 contains no indication of an intent to create a private right, much less a private remedy. The statute's text is focused on the local official it regulates, not individual voters. *See* 52 U.S.C. § 10101(a)(2) ("No person acting under color of law shall . . . ."). "Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." *Sandoval*, 532 U.S. at 289 (quotation omitted). Section 1971 "is framed in terms of the obligations imposed on the regulated party" (the local official) while voters are "referenced only as an object of that obligation." *Logan v. U.S. Bank Nat'l Ass'n*, 722 F.3d 1163, 1171 (9th Cir. 2013); *see also Conservation Force v. Delta Air Lines, Inc.*, 190 F. Supp. 3d 606, 616 (N.D. Tex. 2016), *aff'd*, 682 F. App'x 310 (5th Cir. 2017).

Although Section 1971 refers to "the right of any individual to vote in any election," 52 U.S.C. § 10101(a)(2)(B), it does not contain any "'rights-creating' language." *Sandoval*, 532 U.S. at 288. The right to vote to which Section 1971 refers is not a federal right at all. It is a right based on state law. The Supreme "Court has often noted that the Constitution does not confer the right of suffrage upon any one and that the right to vote, *per se*, is not a constitutionally protected right." *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 9 (1982) (quotations and citation omitted). Of course, federal law affects the grounds on which that state-law right can "be denied or abridged," thereby creating federal non-discrimination rights. U.S. Const. amend. XV. But the relevant provision of Section 1971 does not refer to those federal rights. Even if it did, such a reference to a right created elsewhere in federal law

14

would not transform Section 1971 itself into a rights-creating provision.

In short, Section 1971 does not create a federal right "in clear and unambiguous terms." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002). As a result, Plaintiffs cannot bring a private cause of action.

Moreover, Section 1971 does not create private remedies. Instead, it authorizes the Attorney General to bring suit. *See* 52 U.S.C. § 10101(c). "The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Sandoval*, 532 U.S. at 290. Because Section 1971 does not create an implied right of action, Plaintiffs first claim should be dismissed. *See* Compl. ¶¶ 26–30.

Even if there were a private cause of action, it would apply only to voters, not political parties and partisan entities like Plaintiffs here. Statutory and prudential standing would still prevent Plaintiffs from suing. *See supra* Part II.C.

Moreover, sovereign immunity bars this claim. Plaintiffs presumably rely on the *Ex parte Young* exception to sovereign immunity, but it does not apply here. "[W]here Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young*." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74 (1996); *see also Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 277 (1997) (opinion of Kennedy, J.) ("Last Term, however, we did not allow a suit raising a federal question to proceed based on Congress' provision of an alternative review mechanism."). Section 1971 establishes a detailed remedial scheme. *See* 52 U.S.C. § 10101(c)–(g) (authorizing the Attorney General to sue under certain circumstances, listing potential remedies, and providing for a three-judge court). And given that the Secretary does not enforce Section 13.002, *see supra* Part I, there are "special factors counseling hesitation." *Coeur d'Alene Tribe of Idaho*, 521 U.S. at 280 (opinion of Kennedy, J.). Because Plaintiffs' claims are more akin to a suit against the State

regarding its statute than a suit against an officer for *ultra vires* actions, "the real affront to [Texas] of allowing [the] suit to proceed" is much greater. *Id.* at 277.

Moreover, Plaintiffs' claim fails on the merits. As explained below, providing a proper signature is "material" under Texas law. 52 U.S.C. § 10101(a)(2)(B); *see infra* Part V.

## IV.    Section 13.002 Is Constitutional

Plaintiffs challenge Section 13.002 under both the *Anderson-Burdick* doctrine and the Equal Protection Clause. *See* Compl. ¶¶ 31–40. Neither challenge can succeed.

### A.    Section 13.002 Is Justified under *Anderson-Burdick*

The *Anderson-Burdick* test requires a court to "first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 387 (5th Cir. 2013) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). Then, the Court "must identify and evaluate the precise interest put forward by the State as justifications for the burden imposed by its rule." *Id.* (quoting *Anderson*, 460 U.S. at 789). Finally, the Court weighs the "character and magnitude of the asserted injury" against the "precise interests put forward by the State," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* at 387–88 (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). When a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the state's important regulatory interests are generally sufficient to justify" the restrictions. *Anderson*, 460 U.S. at 788.

Here, any burden is *de minimis*. Texas law gives would-be voters multiple options: They can either sign a paper application or, if they want to register at a DPS office, physically sign an electronic keypad. *See* Compl. ¶ 23. Signature requirements are a familiar aspect of modern life. Asking for a signature from a citizen registering to vote is not a serious inconvenience. *See Lemons v. Bradbury*, 538

F.3d 1098, 1104 (9th Cir. 2008) (holding that a system analyzing voters' signatures imposed "only a minimal burden"). Further, this burden is equally shared and non-discriminatory. All Texans registering to vote must provide a signature in one of the two methods allowed under Texas law. *See Anderson*, 460 U.S. at 788.

Plaintiffs overstate the burden Section 13.002 imposes by suggesting that those who do not submit a proper application are denied the right to vote. As an initial matter, the consequence of non-compliance is not automatic ineligibility to vote. Pursuant to Section 13.073 of the Election Code, the voter registrar sends a letter informing the applicant that the application is incomplete. If the applicant submits a proper application within ten days, the application will be considered submitted as of the original submission date. *See* Tex. Elec. Code § 13.073. Moreover, Plaintiffs conflate the burden of *complying* and the consequence of *not complying*. The former matters; the latter does not. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 198 (2008) (lead opinion) (analyzing the burden on voters of obtaining identification rather than the consequence of attempting to vote without identification); *id.* at 209 (Scalia, J., concurring in the judgment) (same).

Section 13.002 imposes only minimal, non-discriminatory burdens. It is therefore subject to relaxed scrutiny. *See Burdick*, 504 U.S. at 434. But in this case, the State's important interests would justify Section 13.002 under any level of scrutiny.

First, Section 13.002 helps maintain accurate voting rolls and combat fraud. Inaccuracies in voter registration are a serious problem. *See Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1838 (2018) ("It has been estimated that 24 million voter registrations in the United States—about one in eight—are either invalid or significantly inaccurate."). Texas has a weighty "interest in preventing voter registration fraud," *Voting for Am.*, 732 F.3d at 394–95, and other inaccuracy-causing conduct. "Any corruption in voter registration affects a state's paramount obligation to ensure the integrity of the voting process and threatens the public's right to democratic government." *Id.* at 394. Requiring a

signature impresses upon the applicant the importance of providing accurate information. And because a signature could be used against a fraudster, Section 13.002 both deters fraud and assists law enforcement in detecting and prosecuting that fraud.

Moreover, Texas has an interest in maintaining the solemnity of voter registration. The right to vote has been called "sacred." *Trustees of Dartmouth Coll. v. Woodward*, 17 U.S. (4 Wheat.) 518, 701 (1819); *Save Our Aquifer v. City of San Antonio*, 237 F. Supp. 2d 721, 727 (W.D. Tex. 2002). The exercise of a sacred right should be undertaken seriously, not casually. The State's signature requirement helps to impress upon would-be voters the serious nature of the rights and obligations connected to voting. People are accustomed to important events requiring signatures. An application for a marriage license must be signed in person. *See* Tex. Fam. Code § 2.002(5). Purchasing a home often requires in-person signatures, and the same is true for consenting to a medical procedure. Requiring such a signature sets the activity apart from routine events, like online transactions that require only an electronic "signature" like clicking "I agree" to various unread terms and conditions.

In light of the minimal burden on voters and the weighty State interests supporting it, Section 13.002 is constitutional under the *Anderson-Burdick* framework.

**B.    The Signature Requirement Is Not Discriminatory**

Section 13.002 does not violate the Equal Protection Clause. It applies equally to all applicants. *See supra* Part IV.A. Plaintiffs complain that local officials distinguish between applications "based upon the method by which [the applicants] signed their applications." Compl. ¶ 34. The difference between methods of signing does not trigger heightened scrutiny, and Section 13.002 easily survives rational-basis review for the reasons stated above. *See supra* Part IV.A.

Plaintiffs also contend that a lack of guidance to local officials "inevitably results in the arbitrary denial of voter registration applications, and by extension the right to vote." Compl. ¶ 34. That is not a plausible factual allegation. First, as explained above, the designtaion of an application

as incomplete leads to an opportunity to correct the application, not the denial of the right to vote. *See supra* Part IV.A. Second, there is no reason to think local officials apply Section 13.002 arbitrarily. They all seek to determine whether an applicant properly signed the form in question. Perhaps some improper signatures go undetected, but the possibility of imperfect enforcement does not render a law arbitrary. "[T]he failure to enforce a right, or cure a wrong, in one situation is not a defense to enforcing that right or curing that wrong in another situation." *Moses v. Wash. Par. Sch. Bd.*, 379 F.3d 319, 323 (5th Cir. 2004). A motorist caught speeding cannot object to a ticket on the ground that the officer failed to catch other speeders too. *Cf. Engquist v. Ore. Dep't of Agr.*, 553 U.S. 591, 604 (2008) ("[A]ssuming that it is in the nature of the particular government activity that not all speeders can be stopped and ticketed, complaining that one has been singled out for no reason does not invoke the fear of improper government classification."). Neither can Plaintiffs complain that some applicants might get away with passing off an improper signature in violation of Section 13.002.

## V.        Plaintiffs Cannot Bring a State-Law Claim

Arguing that the Secretary has erroneously "interpreted" Section 13.002, Plaintiffs claim that requiring an original signature actually violates that provision. Compl. ¶¶ 41–43 (Count IV). Sovereign immunity bars this claim. Even if the Secretary were the right defendant, *but see supra* Part I, the *Ex parte Young* exception does not apply to alleged violations of state law.

The Supreme Court has held that *Ex parte Young* is "inapplicable in a suit against state officials on the basis of state law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984); *see also Hughes v. Savell*, 902 F.2d 376, 378 n.2 (5th Cir. 1990); *Lelsz v. Kavanagh*, 807 F.2d 1243, 1252 (5th Cir. 1987) ("*Pennhurst II* thus would prevent a federal court from exercising remedial authority in any form if the award of such relief against a nonconsenting state is based on a state law claim.").

Moreover, Plaintiffs have not identified any private cause of action allowing them to sue the Secretary for an alleged violation of the Texas Election Code. Section 1983 applies only to claims

based on federal law. *See* 42 U.S.C. § 1983. The Election Code allows judicial review of certain decisions concerning registration applications, but Plaintiffs have not attempted to use that process. *See* Tex. Elec. Code §§ 17.001–.008.

In any event, the Secretary has not violated state law. Demanding an original signature on registration applications is perfectly consistent with the statute's requirement that the application be "signed by the applicant." Tex. Elec. Code § 13.002(b). To the extent the Court concludes the Secretary has enforced Section 13.002 through adoption of a "wet signature rule" or any other "interpretation," *but see supra* Part I, the Secretary's interpretation of the statute is entitled to deference. *See Voting for Am.*, 732 F.3d at 387; *R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624 (Tex. 2011).

## CONCLUSION

The Secretary respectfully requests that the Court dismiss Plaintiffs' Complaint.

Date: January 31, 2020

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy Attorney General for Legal Counsel

Respectfully submitted.

PATRICK K. SWEETEN
Associate Deputy for Special Litigation

WILLIAM T. THOMPSON
Special Counsel for Civil Litigation

CORY A. SCANLON
Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-076)
Austin, Texas 78711-2548
Tel.: (512) 936-1414
Fax: (512) 936-0545
patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov
cory.scanlon@oag.texas.gov

COUNSEL FOR THE TEXAS SECRETARY OF
STATE

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on January 31, 2020, and that all counsel of record were served by CM/ECF.

PATRICK K. SWEETEN