**IN THE UNITED STATES DISTRIC COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

TEXAS DEMOCRATIC PARTY; DSCC;
and DCCC,

      *Plaintiffs*,

v.

RUTH R. HUGHS, in her official capacity as
the Texas Secretary of State,

      *Defendant*.

CIVIL ACTION NO. 5:20-cv-00008-OLG

**THE TEXAS SECRETARY OF STATE'S MOTION TO DISMISS**

Table of Contents ................................................................................................................................ ii

Introduction ......................................................................................................................................... 1

Argument ............................................................................................................................................. 1

I.      The Secretary Is Not a Proper Defendant .............................................................................. 1

    A.      Sovereign Immunity Bars Plaintiffs' Claims ................................................................. 1

    B.      Plaintiffs Lack Article III Standing to Sue the Secretary ............................................. 4

II.     Plaintiffs Do Not Have Standing to Challenge Section 13.002 ............................................. 6

    A.      Plaintiffs Lack Associational Standing ............................................................................ 6

    B.      Plaintiffs Do Not Have Organizational Standing .......................................................... 7

    C.      Plaintiffs Cannot Show Statutory Standing .................................................................. 11

III.    Plaintiffs Cannot Sue under the Civil Rights Act ............................................................... 12

IV.     Section 13.002 Is Constitutional ............................................................................................ 15

    A.      Section 13.002 Is Justified under *Anderson-Burdick* ................................................... 15

    B.      The Signature Requirement Is Not Discriminatory ..................................................... 17

    C.      Plaintiffs' New-Found Due Process Claim Fails as a Matter of Law .......................... 18

Conclusion ......................................................................................................................................... 20

## INTRODUCTION

The Secretary of State moves to dismiss. *See* Fed. R. Civ. P. 12(b)(1), (6). The Texas Democratic Party, Democratic Senatorial Campaign Committee, and Democratic Congressional Campaign Committee ("Plaintiffs") complain that local officials have rejected voter registration applications submitted by third parties due to the lack of a proper signature. Those officials did so pursuant to the Texas Election Code's signature requirement. *See* Tex. Elec. Code § 13.002. Plaintiffs' complaint suffers from fundamental jurisdictional defects. First, Plaintiffs sued the Texas Secretary of State, even though she does not implement or enforce Section 13.002. Second, Plaintiffs have not plausibly alleged any certainly impending injury in fact that could support standing to seek prospective relief against the enforcement of Section 13.002.

Moreover, each of Plaintiffs' claims fails individually. For Count I, Plaintiffs do not have a private cause of action. Counts II, III, and IV should be dismissed because Section 13.002 is constitutional. It imposes, at most, a minimal burden on voters but advances weighty state interests in protecting the franchise. Moreover, Count IV—an improper effort to transform Plaintiffs' abandoned state-law claim into a due process claim—fails both because the Secretary is following state law and because "substantive due process" does not incorporate every jot and tittle of state law.

## ARGUMENT

## I.      The Secretary Is Not a Proper Defendant

Plaintiffs' suit against the Secretary fails because she does not enforce Section 13.002. Local registrars approve or reject registration applications under the standards set out in the Texas Election Code. The Secretary neither handles applications herself nor controls the local officials who do. As a result, *Ex parte Young* does not apply, and Plaintiffs lack standing to sue the Secretary.

### A.      Sovereign Immunity Bars Plaintiffs' Claims

Sovereign immunity precludes claims against state officials unless the *Ex parte Young* exception

applies. *See McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 412 (5th Cir. 2004). *Ex parte Young* "rests on the premise—less delicately called a 'fiction'—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes. The doctrine is limited to that precise situation . . . ." *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (citation omitted).

Consequently, *Ex parte Young* applies only when the defendant enforces the challenged statute. *See Ex parte Young*, 209 U.S. 123, 157 (1908) (requiring "some connection with the enforcement of the act"); *City of Austin v. Paxton*, 943 F.3d 993, 1001–02 (5th Cir. 2019); *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) (requiring the defendant have "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty").

Texas law makes local voter registrars, not the Secretary, responsible for approving or rejecting applications: "The registrar shall review each submitted application for registration to determine whether it complies with Section 13.002 and indicates that the applicant is eligible for registration." Tex. Elec. Code § 13.071. Indeed, Plaintiffs concede as much by focusing their complaint on whether *county officials* "would process and accept registration applications." ECF 12 ¶ 19 ("Travis County registrar"); *see also id.* ¶ 3 ("the county registrar"); *id.* ¶ 20 ("how the county registrars determined whether an application complied with the wet signature rule"). That alone requires dismissal.

Plaintiffs identify no enforcement actions taken by the Secretary. They assert that the Secretary "instructed county registrars to reject" certain applications, but their citations belie their claim. ECF 12 ¶ 1. First, they point to a press release. *Id.* at 1 n.1. But the press release did not instruct local officials to do anything. It was not even directed to local officials. Instead, it warned voters that they "should be extremely cautious when handing over personal and sensitive information to any unknown third party." It emphasized that the Secretary "is committed to ensuring all Texans understand proper and legal procedures for registering to vote" and pointed voters to the Secretary's official website. The

only reference to signatures emphasized that the Secretary had not vetted and authorized any particular website: "Any web site that misleadingly claims to assist voters in registering to vote online by simply submitting a digital signature is not authorized to do so." That is a statement of fact, not an order to local officials, because "online voter registration is not available in the State of Texas."[1]

Second, Plaintiffs cite online articles paraphrasing an employee of the Secretary of State, ECF 12 at 1 n.1, ¶ 18. That is not enough to plausibly allege that the Secretary ordered local officials to reject applications. Even if the Secretary had issued a directive to local officials, it would not have bound them. The Secretary does not control registrars' application decisions. She cannot coerce local officials into following Section 13.002. Plaintiffs acknowledge this reality by alleging that the Travis County registrar initially decided to accept the relevant applications on the advice of his own "legal counsel." ECF 12 ¶ 19. That was "after the Secretary" supposedly "announced the wet signature rule." *Id.* Clearly, Travis County officials did not think the Secretary could require them to process applications in a particular way. To be sure, the Travis County registrar later decided to reject the applications, but Plaintiffs do not allege that the Secretary coerced him into doing so. *Id.*

Plaintiffs' statement that "[c]ounty election officials in Texas follow the Secretary's directives regarding election law," even if true, does not change the fact that the Secretary does not approve or reject applications. *Id.* ¶ 8. Nor does it suggest such directives are binding rather than persuasive. Whether "her directives and opinions are enforceable" is a question of law, not a factual allegation assumed to be true at the pleading stage. *Id.*

Plaintiffs also point to the Secretary's duties under the Election Code, but none of them allows her to coerce local officials regarding registration applications, much less handle applications herself.

---

[1] Press Release, Texas Secretary of State, Secretary Pablos Reminds Texans To Exercise Caution When Registering To Vote (Oct. 4, 2018), https://www.sos.texas.gov/about/newsreleases/2018/100418.shtml.

First, Plaintiffs highlight the Secretary's role as "chief election officer," *id.* at ¶ 15, but that title is not "a delegation of authority to care for any breakdown in the election process." *Bullock v. Calvert*, 480 S.W.2d 367, 372 (Tex. 1972) (narrowly interpreting "chief election officer"). Second, Plaintiffs emphasize the Election Code provision for "obtain[ing] and maintain[ing] uniformity." ECF 12 ¶ 15. But that establishes the Secretary's goal, not the powers she has to achieve it. Third, Plaintiffs note the Secretary's role in "implement[ing] and maintain[ing] a statewide computerized voter registration list." *Id.* (quoting Tex. Elec. Code § 18.061(a)). But that database reflects decisions made by local officials, not the Secretary's assessment of registration applications. *See* Tex. Elec. Code § 18.061(c).

Last, Plaintiffs point to the Secretary's duties to (1) "prepare detailed and comprehensive written directives and instructions" regarding election laws (2) "distribute these materials to the appropriate state and local authorities having duties in the administration of these laws," and (3) "assist and advise all election authorities with regard to the application, operation, and interpretation of" election laws. ECF 12 ¶ 15 (quoting Tex. Elec. Code § 31.003, .004(a)). None of these duties allows the Secretary to enforce Section 13.002 herself or coerce local officials into doing so.

But even if she could, a federal court could not order her to exercise such a power. The *Ex parte Young* exception is limited to injunctions "prevent[ing] [a state official] from doing that which he has no legal right to do." *Ex parte Young*, 209 U.S. at 159. It does not authorize injunctions directing "affirmative action." *Id.*; *see also Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 691 n.11 (1949) (noting sovereign immunity bars a claim "if the relief requested cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign"). Thus, sovereign immunity bars "cases where the [defendant] sued could satisfy the court decree only by acting in an official capacity." *Zapata v. Smith*, 437 F.2d 1024, 1026 (5th Cir. 1971).

## B.     Plaintiffs Lack Article III Standing to Sue the Secretary

Plaintiffs cannot establish standing to sue the Secretary because her actions do not cause their

alleged injuries. Whether a registration application is accepted or rejected depends on the actions of local officials, not the Secretary. Plaintiffs' asserted injuries are not "fairly traceable to the challenged action of the defendant"; they are "the result of the independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quotation and alterations omitted).

Plaintiffs' argument that a *statute or rule* causes their injuries is irrelevant to the question at hand: whether *the Secretary* causes Plaintiffs' injuries. *See Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001) (en banc) (dismissing for lack of standing because courts should not "confuse[] the statute's immediate coercive effect on the plaintiffs with any coercive effect that might be applied by the defendants").

For similar reasons, Plaintiffs' purported injuries are not redressable. Relief against the Secretary would not accomplish anything. Plaintiffs request a court order (1) "enjoining the Secretary . . . from implementing, enforcing, or giving any effect to the wet signature rule," (2) "enjoining Defendant from rejecting voter registration applications for lack of a wet-ink signature," and (3) "requiring Defendant to permit voters whose voter registration applications were previously rejected for lack of a wet signature to resubmit their applications." ECF 12 at 18. None of those injunctions would meaningfully change the status quo. The Secretary does not implement, enforce, or give effect to the supposed rule. The Secretary does not reject registration applications. And she does not forbid voters from submitting (or resubmitting) applications.

For one of their requested injunctions, Plaintiffs propose to include "all persons acting in concert with" the Secretary, "including all county voter registrars." ECF 12 at 18. As an initial matter, local officials are not "in active concert or participation with" the Secretary. Fed. R. Civ. P. 65(d)(2). They are elected or appointed locally and are not "subject to [the Secretary's] control." *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945). Regardless, a plaintiff cannot use non-parties within the scope of Rule 65 to satisfy standing requirements. *See Lujan*, 504 U.S. at 560 (requiring traceability to "the defendant"); *Okpalobi*, 244 F.3d at 427 (finding no standing "[b]ecause these defendants have no

powers to redress the injuries alleged").[2]

## II.   Plaintiffs Do Not Have Standing to Challenge Section 13.002

Because Plaintiffs seek prospective relief, they must establish an "imminent" future injury. *Lujan*, 504 U.S. at 564. The Supreme Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quotation omitted). Allegations of "an imminent injury" must be "[p]laintiff-specific." *Stringer v. Whitley*, 942 F.3d 715, 722 (5th Cir. 2019). "[F]uture injury to others is irrelevant; plaintiffs seeking injunctive relief must show a continuing or threatened future injury to themselves." *Id.* at 721.

### A.   Plaintiffs Lack Associational Standing

A plaintiff cannot have associational standing unless one of its members would have standing to sue individually. *See Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 536 (5th Cir. 2019). Thus, Plaintiffs must "identify members who have suffered the requisite harm" to establish injuries in fact. *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009); *see also NAACP v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010) (requiring evidence of "a specific member").

Because Plaintiffs have not alleged the existence of specific members, let alone specific members with individual standing, their claims should be dismissed. *See Ga. Republican Party v. SEC*, 888 F.3d 1198, 1203 (11th Cir. 2018) (holding that the Georgia Republican Party lacked associational standing because it "has failed to allege that a specific member will be injured by the rule, and it certainly offers no evidence to support such an allegation"); *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir.

---

[2] Although *OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017), found standing to sue the Secretary, its reasoning does not apply here. First, sovereign immunity had been abrogated, *see id.* at 614, so it did not consider the Secretary's *Ex parte Young* argument. *See supra* Part I.A. Second, *OCA-Greater Houston* distinguished *Okpalobi* on the ground that *Okpalobi* involved a private right of action. *See OCA-Greater Hous.*, 867 F.3d at 613. This case also involves a private right of action. Although the Secretary cannot enforce Section 13.002 against local officials, a losing candidate may be able to do so through an election contest. *See* Tex. Elec. Code §§ 221.003(a), 232.002. In any event, the extent of the Secretary's power must be determined on a case-by-case basis. As a result, *OCA-Greater Houston*'s ruling on that issue cannot extend beyond the record and briefing before that court.

2016) (dismissing under Rule 12(b)(1) because plaintiff did not identify a member who was affected by the challenged regulation); *Disability Rights Wis., Inc. v. Walworth Cty. Bd. of Supervisors*, 522 F.3d 796, 804 (7th Cir. 2008) (concluding a plaintiff "has not established associational standing" because its "Complaint does not identify any Walworth County disabled student with standing to bring suit").

The DSCC and the DCCC do not describe themselves as membership organizations. ECF 12 ¶¶ 11–14. Not having members is fatal to associational standing. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977) (requiring "indicia of membership").

TDP claims to have "members and constituents . . . including Texans who regularly support candidates affiliated with the Democratic Party," ECF 12 ¶ 8, but that is insufficient. Plaintiffs have not alleged that TDP's "members elect leadership, serve as the organization's leadership, and finance the organization's activities, including the case's litigation costs." *Tex. Indigenous Council v. Simpkins*, No. 5:11-cv-315, 2014 WL 252024, at *3 (W.D. Tex. Jan. 22, 2014) (quoting *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 344 n.9 (5th Cir. 2012)); *see also Ass'n for Retarded Citizens of Dall. v. Dall. Cty. Mental Health & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir. 1994).

Plaintiffs may work on behalf of individual candidates, but "standing on behalf of the group served by the organization" has "never [been] recognized by any court." *Ne. Ohio Coal. for Homeless v. Blackwell*, 467 F.3d 999, 1010 n.4 (6th Cir. 2006); *see also id.* at 1013 (McKeague, J., concurring).

Absent plausible allegations that Section 13.002 will lead to the rejection of registration applications from identified members, Plaintiffs cannot establish associational standing.

## B.     Plaintiffs Do Not Have Organizational Standing

An organization lacks organizational standing unless it satisfies the same Article III requirements applicable to individuals: injury in fact, causation, and redressability. *See City of Kyle*, 626 F.3d at 237 (citing *Lujan*, 504 U.S. at 560–61). In an appropriate case, an organization can establish an injury in fact by showing that the challenged law conflicts with the organization's mission and

"perceptibly impair[s]" its activities. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

If an organization avoids the impairment of its activities by spending additional resources to combat the effects of the challenged law, then the "drain on the organization's resources" may constitute an injury in fact. *Id.*; *see City of Kyle*, 626 F.3d at 238. But if the alleged effect of the challenged law on the plaintiff's activities would not qualify as an injury in fact, the plaintiff's reaction to the challenged law cannot qualify either. *See Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 379 (D.C. Cir. 2017) ("[A]ny resources [the organizational plaintiff] used to counteract the lack of a privacy impact assessment—an assessment in which it has no cognizable interest—were a self-inflicted budgetary choice that cannot qualify as an injury in fact." (quotation omitted)). That is because a plaintiff "cannot manufacture standing by choosing to make expenditures based on" an alleged harm that does not itself qualify as an injury in fact. *Clapper*, 568 U.S. at 402.

Here, Plaintiffs fail on both theories. They have not plausibly alleged that Section 13.002 causes them cognizable injuries in fact. And their reactions to Section 13.002 do not qualify either.

### 1. Plaintiffs Have Not Plausibly Alleged Impairment of Their Activities or Direct Conflict with Their Missions

To establish standing under an impairment theory, Plaintiffs must plausibly allege both that Section 13.002 makes their "*activities* more difficult" and that there is "a direct conflict between the defendant's conduct and [their] *mission.*" *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996); *see also id.* at 1429 (requiring that the "action challenged" be "at loggerheads with the [plaintiff's] stated mission"). Plaintiffs have not done so here. As a result, "it is entirely speculative whether the defendant's conduct is impeding the organization's activities." *Id.* at 1430.

Plaintiffs do not allege that Section 13.002 prohibits their activities. Nor could they. The statute does not prohibit "supporting Democratic Party candidates," helping voters, or "campaign[ing] to boost voter turnout." ECF 12 ¶¶ 8, 11, 13. Plaintiffs are free to engage in such activities.

Recognizing this, Plaintiffs instead rely on the contention that Section 13.002 "limit[s] the

effectiveness of" their activities and "make[s] it more difficult" to "accomplish [their] mission of electing Democrats." ECF 12 ¶ 10; *accord id.* ¶¶ 11, 14. But there is no "direct conflict" between Section 13.002 and Plaintiffs' mission. *Nat'l Treasury Emps. Union*, 101 F.3d at 1430.

In *National Treasury Employees Union*, a public-sector union wanted to challenge the Line Item Veto Act. But the union's "mission [wa]s to obtain improved worker conditions—a mission not necessarily inconsistent with the Line Item Veto Act." *Id.* Thus, the union rested its standing on the possibility the President would use his line-item veto authority to affect benefits for government workers. The court found no standing: "For a myriad of reasons, a given President may be disinclined to exercise the item veto power as to government employee benefits." *Id.* Such a speculative possibility could not be an injury in fact. *See Clapper*, 568 U.S. at 409.

So too here. Section 13.002 is not in "direct conflict" with Plaintiffs' mission of electing Democrats. It is not even in indirect conflict. Plaintiffs do not allege that any Democratic voters are unable to register. Nor do they allege that registration is more difficult for Democratic voters than other voters. Indeed, Plaintiffs conspicuously fail to allege that Section 13.002 will cause any Democratic candidate to lose a race the candidate otherwise would have won. Thus, Plaintiffs cannot establish that the statute impairs their organizational activities or directly conflicts with their mission.

### 2. Plaintiffs Cannot Establish Standing Based on Diversion of Resources

Plaintiffs cannot claim standing based on a diversion of resources. ECF 12 ¶ 10–11, 14. The alleged effects of Section 13.002 on Plaintiffs' activities are not injuries in fact, so Plaintiffs' reactions are not either. A plaintiff "cannot manufacture standing by choosing to make expenditures based on" an alleged harm that is not itself an injury in fact. *Clapper*, 568 U.S. at 402.

That general principle applies with equal force to organizational standing. In *National Treasury Employees Union*, because the possibility that the President would line-item veto benefits for government workers was not an injury in fact, the union's reaction to that possibility was also not an

injury in fact. "Absent a direct conflict between [the union's] mission and the Line Item Veto Act, we are unsure whether [the union's] additional expenditure of funds is truly necessary to improve the working conditions of government workers or rather is unnecessary alarmism constituting a self-inflicted injury." *Nat'l Treasury Emps. Union*, 101 F.3d at 1430.

The same reasoning applies here. Because there is no "direct conflict" between Section 13.002 and Plaintiffs' mission, Plaintiffs seem to base their claim to organizational standing on the speculative possibility that Section 13.002 will cause a Democratic candidate to lose an election. *See* ECF 12 ¶ 11 (alleging that the DSCC must divert resources "to support its mission" and that its mission is "electing the Democratic Party candidate"). But as noted above, Plaintiffs do not allege any facts to support this speculation. Thus, they cannot establish that their "additional expenditure of funds is truly necessary" for their mission rather than "unnecessary alarmism constituting a self-inflicted injury." *Nat'l Treasury Emps. Union*, 101 F.3d at 1430.

Moreover, there are additional reasons Plaintiffs' expenditures cannot support standing. "Not every diversion of resources to counteract [a] defendant's conduct . . . establishes an injury in fact." *City of Kyle*, 626 F.3d at 238. To establish standing, "an organizational plaintiff must explain how the activities it undertakes in response to the defendant's conduct differ from its 'routine [] activities,'" and must "identify 'specific projects that [it] had to put on hold or otherwise curtail in order to respond to' the defendant's conduct." *Def. Distributed v. U.S. Dep't of State*, No. 1:15-cv-372, 2018 WL 3614221, at *4 (W.D. Tex. July 27, 2018) (quoting *City of Kyle*, 626 F.3d at 238).

Plaintiffs cannot satisfy either requirement. First, their alleged reactions to Section 13.002 do not meaningfully differ from their "day-to-day operations." *ACORN v. Fowler*, 178 F.3d 350, 358 (5th Cir. 1999). Plaintiffs' only alleged reactions are to support Democratic candidates, which is what they always do. ECF 12 ¶ 10 ("to assist voters in completing the registration process and increase turnout"); *id.* ¶ 11 ("to ensure that eligible citizens are registered to vote"); *id.* ¶ 14 ("to accomplish its goal of

significantly increasing voter registration and turnout in Texas"). "Plaintiffs have not explained how" their reactions "differ from [their] routine [political] activities." *City of Kyle*, 626 F.3d at 238. Second, Plaintiffs "have not identified any specific projects that [they] had to put on hold or otherwise curtail in order to respond to" Section 13.002. C*ity of Kyle*, 626 F.3d at 238. Vague references to "other critical priorities" and "efforts" or "programs in other states" do not suffice. ECF 12 ¶¶ 10–11, 14.

### C.     Plaintiffs Cannot Show Statutory Standing

Even if Plaintiffs had Article III standing, they would lack statutory standing. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014). Section 1983 provides a cause of action only when *the plaintiff* suffers "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. It does not provide a cause of action to plaintiffs claiming an injury based on the violation of a *third party's* rights. *See Coon v. Ledbetter*, 780 F.2d 1158, 1160 (5th Cir. 1986) ("[L]ike all persons who claim a deprivation of constitutional rights, [plaintiffs] were required to prove some violation of their personal rights.").

Section 1983 "incorporates, but without exceptions, the Court's 'prudential' principle that the plaintiff may not assert the rights of third parties." David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41, 45. When "[t]he alleged rights at issue" belong to a third party, rather than the plaintiff, the plaintiff lacks statutory standing, regardless of whether the plaintiff has suffered his own injury. *Danos v. Jones*, 652 F.3d 577, 582 (5th Cir. 2011); *see also Conn v. Gabbert*, 526 U.S. 286, 292–93 (1999) (holding that a lawyer "clearly had no standing" to bring a § 1983 claim because a plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties").

Here, all of Plaintiffs' claims depend on the right to vote. ECF 12 ¶¶ 27, 32, 36, 42. But Plaintiffs are artificial entities without voting rights. "It goes without saying that political parties, although the principal players in the political process, do not have the right to vote." *Vieth v.*

*Pennsylvania*, 188 F. Supp. 2d 532, 546 (M.D. Pa. 2002); *see also Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77, 91 (2d Cir. 2015). Plaintiffs are necessarily asserting the rights of third parties and therefore cannot sue under § 1983. Because this follows from the statute itself, Plaintiffs cannot invoke any prudential exceptions. *See Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) ("Because Congress specified in the statute who may sue, prudential standing principles do not apply."); *see also* Currie, 1981 Sup. Ct. Rev. at 45.

But even if Plaintiffs could invoke prudential-standing exceptions, their complaint does not do so. Plaintiffs do not allege that they have "a 'close' relationship with" voters or that voters face any "hindrance" to protecting their "own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (noting the Supreme Court has generally "not looked favorably upon third-party standing").

## III.     Plaintiffs Cannot Sue under the Civil Rights Act

In Count I, Plaintiffs claim requiring a signature violates Section 1971 of the Civil Rights Act. Their claim should be dismissed because Congress did not give Plaintiffs a private cause of action. In any event, the Secretary has not violated the Civil Rights Act.

In Section 1971, Congress created a cause of action for "the Attorney General," not private plaintiffs. 52 U.S.C. § 10101(c). Section 1971 does not create an implied cause of action, as many courts recognize. *See, e.g.*, *McKay v. Thompson*, 226 F.3d 752, 756 (6th Cir. 2000) ("Section 1971 is enforceable by the Attorney General, not by private citizens."); *Mixon v. State of Ohio*, 193 F.3d 389, 406 n.12 (6th Cir. 1999); *Gilmore v. Amityville Union Free Sch. Dist.*, 305 F. Supp. 2d 271, 279 (E.D.N.Y. 2004); *Spivey v. State of Ohio*, 999 F. Supp. 987, 996 (N.D. Ohio 1998); *McKay v. Altobello*, No. 2:96-cv-3458, 1996 WL 635987, at *2 (E.D. La. Oct. 31, 1996); *Cartagena v. Crew*, No. 1:96-cv-3399, 1996 WL 524394, at *3 n.8 (E.D.N.Y. Sept. 5, 1996); W*illing v. Lake Orion Cmty. Sch. Bd. of Trustees*, 924 F. Supp. 815, 820 (E.D. Mich. 1996); *Good v. Roy*, 459 F. Supp. 403, 405–06 (D. Kan. 1978).

This authority is in keeping with the modern approach to implied causes of action. In *Alexander*

*v. Sandoval*, 532 U.S. 275, 287 (2001), the Supreme Court rejected the looser approach to implying causes of action prevalent in the 1960s. Today, "private rights of action to enforce federal law must be created by Congress." *Id.* at 286. "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id.* Absent that intent, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Id.* at 286–87.

Section 1971 contains no indication of an intent to create a private right, much less a private remedy. The statute's text is focused on the local official it regulates, not individual voters. *See* 52 U.S.C. § 10101(a)(2) ("No person acting under color of law shall . . . ."). "Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." *Sandoval*, 532 U.S. at 289 (quotation omitted). Section 1971 "is framed in terms of the obligations imposed on the regulated party" (the local official) while voters are "referenced only as an object of that obligation." *Logan v. U.S. Bank Nat'l Ass'n*, 722 F.3d 1163, 1171 (9th Cir. 2013); *see also Conservation Force v. Delta Air Lines, Inc.*, 190 F. Supp. 3d 606, 616 (N.D. Tex. 2016), *aff'd*, 682 F. App'x 310 (5th Cir. 2017).

Although Section 1971 refers to "the right of any individual to vote in any election," 52 U.S.C. § 10101(a)(2)(B), it does not contain any "'rights-creating' language." *Sandoval*, 532 U.S. at 288. The right to vote to which Section 1971 refers is based on state law. *See Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 9 (1982) ("[T]his Court has often noted that the Constitution does not confer the right of suffrage upon any one and that the right to vote, *per se*, is not a constitutionally protected right." (quotations and citation omitted)). Even if Section 1971 referred to federal rights created elsewhere, *see, e.g.*, U.S. Const. amend. XV, such a reference would not transform Section 1971 itself into a rights-creating provision.

In sum, Section 1971 does not create a federal right "in clear and unambiguous terms." *Gonzaga*

*Univ. v. Doe*, 536 U.S. 273, 290 (2002). As a result, Plaintiffs cannot bring a private cause of action.

Moreover, Section 1971 does not create private remedies. Instead, it authorizes the Attorney General to bring suit. *See* 52 U.S.C. § 10101(c). "The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Sandoval*, 532 U.S. at 290. Because Section 1971 does not create an implied right of action, Plaintiffs first claim should be dismissed. *See* ECF 12 ¶¶ 26–30.

Even if there were a private cause of action, it would apply only to voters, not partisan entities like Plaintiffs here. Plaintiffs would still lack statutory and prudential standing. *See supra* Part II.C.

Moreover, sovereign immunity bars this claim. Plaintiffs presumably rely on the *Ex parte Young* exception to sovereign immunity, but it does not apply here. "[W]here Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young*." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74 (1996); *see also Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 277 (1997) (opinion of Kennedy, J.) ("Last Term, however, we did not allow a suit raising a federal question to proceed based on Congress' provision of an alternative review mechanism."). Section 1971 establishes a detailed remedial scheme. *See* 52 U.S.C. § 10101(c)–(g) (authorizing the Attorney General to sue under certain circumstances, listing potential remedies, and providing for a three-judge court). And given that the Secretary does not enforce Section 13.002, *see supra* Part I, there are "special factors counseling hesitation." *Coeur d'Alene Tribe of Idaho*, 521 U.S. at 280 (opinion of Kennedy, J.). Because Plaintiffs' claims are more akin to a suit against the State regarding its statute than a suit against an officer for *ultra vires* actions, "the real affront to [Texas] of allowing [the] suit to proceed" is much greater. *Id.* at 277.

Moreover, Plaintiffs' claim fails on the merits. As explained below, providing a proper signature is "material" under Texas law. 52 U.S.C. § 10101(a)(2)(B); *see infra* Part IV.C.

## IV.    Section 13.002 Is Constitutional

None of Plaintiffs constitutional challenges can succeed.

### A.    Section 13.002 Is Justified under *Anderson-Burdick*

The *Anderson-Burdick* test requires a court to "first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 387 (5th Cir. 2013) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). Then, the Court "must identify and evaluate the precise interest put forward by the State as justifications for the burden imposed by its rule." *Id.* (quoting *Anderson*, 460 U.S. at 789). Finally, the Court weighs the "character and magnitude of the asserted injury" against the "precise interests put forward by the State," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* at 387–88 (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). When a state election law imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the state's important regulatory interests are generally sufficient to justify" the restrictions. *Anderson*, 460 U.S. at 788.

Here, any burden is *de minimis*. Texas law gives would-be voters multiple options: They can either sign a paper application or, if they want to register at a DPS office, physically sign an electronic keypad. *See* ECF 12 ¶ 23. Signature requirements are a familiar aspect of modern life. Asking for a signature from a citizen registering to vote is not a serious inconvenience. *See Lemons v. Bradbury*, 538 F.3d 1098, 1104 (9th Cir. 2008) (holding that a system analyzing voters' signatures imposed "only a minimal burden"). Further, this burden is equally shared and non-discriminatory. All Texans registering to vote must provide a signature. *See Anderson*, 460 U.S. at 788.

Plaintiffs overstate the burden Section 13.002 imposes by suggesting that those who do not submit a proper application are denied the right to vote. As an initial matter, the consequence of non-compliance is not automatic ineligibility to vote. Pursuant to Section 13.073 of the Election Code, the

voter registrar sends a letter informing the applicant that the application is incomplete. If the applicant submits a proper application within ten days, the application will be considered submitted as of the original submission date. *See* Tex. Elec. Code § 13.073. Moreover, Plaintiffs conflate the *burden of complying* and the *consequence of not complying*. Under *Anderson-Burdick*, the former matters; the latter does not. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 198 (2008) (lead opinion) (analyzing the burden on voters of obtaining identification rather than the consequence of attempting to vote without identification); *id.* at 209 (Scalia, J., concurring in the judgment) (same).

Section 13.002 imposes only minimal, non-discriminatory burdens. It is therefore subject to relaxed scrutiny. *See Burdick*, 504 U.S. at 434. But in this case, the State's important interests would justify Section 13.002 under any level of scrutiny.

First, Section 13.002 helps maintain accurate voting rolls and combat fraud. Inaccuracies in voter registration are a serious problem. *See Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1838 (2018) ("It has been estimated that 24 million voter registrations in the United States—about one in eight—are either invalid or significantly inaccurate."). Texas has a weighty "interest in preventing voter registration fraud," *Voting for Am.*, 732 F.3d at 394–95, and other inaccuracy-causing conduct. "Any corruption in voter registration affects a state's paramount obligation to ensure the integrity of the voting process and threatens the public's right to democratic government." *Id.* at 394. Requiring a signature impresses upon the applicant the importance of providing accurate information. And because a signature could be used against a fraudster, Section 13.002 both deters fraud and assists law enforcement in detecting and prosecuting that fraud.

Moreover, Texas has an interest in maintaining the solemnity of voter registration. The right to vote has been called "sacred." *Trustees of Dartmouth Coll. v. Woodward*, 17 U.S. (4 Wheat.) 518, 701 (1819); *Save Our Aquifer v. City of San Antonio*, 237 F. Supp. 2d 721, 727 (W.D. Tex. 2002). The exercise of a sacred right should be undertaken seriously, not casually. The State's signature requirement helps

to impress upon would-be voters the serious nature of the rights and obligations connected to voting. People are accustomed to important events requiring signatures. An application for a marriage license must be signed in person. *See* Tex. Fam. Code § 2.002(5). Purchasing a home often requires in-person signatures, and the same is true for consenting to a medical procedure. Requiring that kind of signature sets the activity apart from routine events, such as online transactions that require only an electronic "signature" like clicking "I agree" to various unread terms and conditions.

In light of the minimal burden on voters and the weighty State interests supporting it, Section 13.002 is constitutional under the *Anderson-Burdick* framework.

## B.    The Signature Requirement Is Not Discriminatory

Section 13.002 does not violate the Equal Protection Clause. It applies equally to all applicants. *See supra* Part IV.A. Plaintiffs complain that local officials distinguish between applications "based upon the method by which [the applicants] signed their applications." ECF 12 ¶ 34. The difference between methods of signing does not trigger heightened scrutiny, and Section 13.002 easily survives rational-basis review for the reasons stated above. *See supra* Part IV.A.

Plaintiffs also contend that a lack of guidance to local officials "inevitably results in the arbitrary denial of voter registration applications, and by extension the right to vote." ECF 12 ¶ 34. That is not a plausible factual allegation. First, as explained above, the designation of an application as incomplete leads to an opportunity to correct the application, not the denial of the right to vote. *See supra* Part IV.A. Second, there is no reason to think local officials apply Section 13.002 arbitrarily. In compliance with state law, they all seek to determine whether an applicant properly signed the form in question. Perhaps some improper signatures go undetected, but the possibility of imperfect enforcement does not render a law arbitrary. "[T]he failure to enforce a right, or cure a wrong, in one situation is not a defense to enforcing that right or curing that wrong in another situation." *Moses v. Wash. Par. Sch. Bd.*, 379 F.3d 319, 323 (5th Cir. 2004). A motorist caught speeding cannot object to a

ticket on the ground that the officer failed to catch other speeders too. *Cf. Engquist v. Ore. Dep't of Agr.*, 553 U.S. 591, 604 (2008) ("[A]ssuming that it is in the nature of the particular government activity that not all speeders can be stopped and ticketed, complaining that one has been singled out for no reason does not invoke the fear of improper government classification."). Plaintiffs cannot complain that some applicants might get away with passing off an improper signature in violation of Section 13.002.

### C.    Plaintiffs' New-Found Due Process Claim Fails as a Matter of Law

Plaintiffs' original complaint brought a state-law claim. *See* ECF 1 ¶¶ 41–43. After the Secretary moved to dismiss that claim, *see* ECF 10 at 19–20, Plaintiffs repackaged it as a substantive-due-process claim based on the "violation of state election law." ECF 12 ¶ 42. "Converting alleged violations of state law into . . . due process claims improperly bootstraps state law into the Constitution." *Stern v. Tarrant Cty. Hosp. Dist.*, 778 F.2d 1052, 1056 (5th Cir. 1985) (en banc). "[T]he due process clause does not require a state to implement its own law correctly." *FM Props. Operating Co. v. City of Austin*, 93 F.3d 167, 174 (5th Cir. 1996) (quotation omitted).

Plaintiffs' substantive-due-process claim fails because "[s]tate law is not a source of liberty interests that are substantively protected by the Fourteenth Amendment . . . ." *Jordan v. Fisher*, 823 F.3d 805, 812 (5th Cir. 2016); *see also id.* at 810 ("The [substantive] component of the due process clause does not rest on state law."). "[B]oth logic and precedent counsel against our using the substantive protections of the due process clause to constitutionalize what is otherwise purely a question of state law." *Levitt v. Univ. of Tex. at El Paso*, 759 F.2d 1224, 1231 (5th Cir. 1985).

Plaintiffs rely on *Duncan v. Poythress*. 657 F.2d 691 (5th Cir. Unit B Sept. 28, 1981), but it does not apply here and is not good law regardless. *Duncan* considered a narrow question: whether substantive due process is violated "if state officials refuse to call an election as required by state law." *Id.* at 696. The court issued an equally narrow holding: State officials may not "disenfranchise voters in violation of state law so that they may fill the seats of government through the power of

appointment." *Id.* at 704. The *Duncan* plaintiffs were "not asking the federal courts to . . . enter into the details of the administration of an election." *Id.* at 703 (quotation and parentheses omitted). "Their request [wa]s far simpler and more basic: they ask for the election itself, as required by state law." *Id.*

Here, Plaintiffs do not allege the Secretary has cancelled any election or issued any appointments. Instead, they ask this Court to "enter into the details of" election administration: What should the Secretary of State do about local officials' implementation of the signature requirement? And as explained above, this case does not involve any "disenfranchisement." People who submit improper applications are notified of the error and invited to submit a proper application.

A dispute about registration-application signatures is one of many "'garden variety' election disputes, which do not rise to the level of constitutional deprivation." *Welch v. McKenzie*, 765 F.2d 1311, 1317 (5th Cir. 1985). Just as "an ordinary dispute over the counting and marking of ballots, involving complaints about missing signatures" does not state a substantive due process claim, neither does Plaintiffs' claim about signatures on registration applications. *Id.*

In any event, *Duncan* is not good law. The opinion has never been binding within the Fifth Circuit,[3] and subsequent Supreme Court precedent precludes applying *Duncan* here. First, Plaintiffs' attempted use of *Duncan* is inconsistent with the Supreme Court's later decision that sovereign

---

[3] Although the opinion was originally published as a Fifth Circuit "Unit B" (i.e., the future Eleventh Circuit) decision on September 28, 1981, the case was not yet final. After the former Fifth Circuit split on October 1, 1981, a petition for rehearing en banc was filed and denied. *See* Exhibit A (docket sheet provided by Eleventh Circuit Clerk's Office). Thereafter, the Supreme Court granted a writ of certiorari to the Eleventh Circuit, *see* 455 U.S. 937 (Feb. 22, 1982), but then dismissed it as improvidently granted, *see* 459 U.S. 1012 (Nov. 15, 1982). A few days later, the mandate issued and the judgment and opinion became effective. *See* Exhibit A; Fed. R. App. P. 41 (providing that a court's mandate—which "consists of" the judgment, the opinion, and directions regarding costs—"is effective when issued"). But even if *Duncan* were considered a Fifth Circuit precedent, it would not be binding because Fifth Circuit judges never got a chance to decide whether to take the case en banc. *See Thomas v. Bryant*, 938 F.3d 134, 189 (5th Cir.) (Willet, J., dissenting), *reh'g en banc granted*, 939 F.3d 629 (5th Cir. 2019) (suggesting an opinion should not be binding precedent "if the full court cannot take it en banc").

immunity bars efforts to sue state officials for violations of state law. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984); ECF 10 at 19–20 (explaining why Plaintiffs' state-law claim was barred). Second, Plaintiffs do not allege that the behavior they challenge "is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998). That is a "threshold question" for "a due process challenge to executive action." *Id.* Third, Plaintiffs' claimed right—the right to submit a voter registration application with an electronic signature—is not "deeply rooted in this Nation's history and tradition" or "implicit in the concept of ordered liberty." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997).

Moreover, Plaintiffs contend they have textually explicit sources for their voting-rights claims: the First Amendment and the Equal Protection Clause. *See* ECF 12 ¶¶ 33, 36. Thus, they cannot rely on the "generalized notion of 'substantive due process.'" *Graham v. Connor*, 490 U.S. 386, 395 (1989) ("Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.").

In any event, the Secretary has not violated state law. Demanding an original signature on registration applications is perfectly consistent with the statute's requirement that the application be "signed by the applicant." Tex. Elec. Code § 13.002(b). To the extent the Court concludes the Secretary has enforced Section 13.002 through adoption of a "wet signature rule" or any other "interpretation," *but see supra* Part I, the Secretary's interpretation of the statute is entitled to deference. *See Voting for Am.*, 732 F.3d at 387; *R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624 (Tex. 2011).

## CONCLUSION

The Secretary respectfully requests that the Court dismiss Plaintiffs' Complaint.

Date: February 28, 2020

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy Attorney General for Legal Counsel

Respectfully submitted.

PATRICK K. SWEETEN
Associate Deputy for Special Litigation

WILLIAM T. THOMPSON
Special Counsel for Civil Litigation

CORY A. SCANLON
Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-076)
Austin, Texas 78711-2548
Tel.: (512) 936-1414
Fax: (512) 936-0545
patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov
cory.scanlon@oag.texas.gov

**COUNSEL FOR THE TEXAS SECRETARY OF
STATE**

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on February 28, 2020, and that all counsel of record were served by CM/ECF.

PATRICK K. SWEETEN

21