**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| TEXAS DEMOCRATIC PARTY; DSCC; DCCC, § § § § Plaintiffs § | | |
| vs. § | Civil Action No. 5:20-cv-00008-OLG | |
| § RUTH R. HUGHS, in her official capacity as the Texas Secretary of State, § § § Defendant. § § | Related to *Stringer v. Cascos*, No. 5:16-cv-00257-OLG | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S NOTICE OF
SUPPLEMENTAL AUTHORITY**

The Eleventh Circuit's opinion in *Jacobson v. Florida Secretary of State*, No. 19-14552, 2020 WL 2049076, at *31 (11th Cir. Apr. 29, 2020), has nothing to do with this case, and the Court should disregard the Secretary's Notice of Supplemental Authority.

As a threshold matter, the Secretary's Notice invites this Court to reject binding Fifth Circuit precedent in favor of an out-of-circuit ruling that stands in conflict with decisions from courts across the country. For over 40 years, courts throughout this Circuit have repeatedly held that election-related injuries are traceable to and redressable by the designation of an official as "chief election officer." *See, e.g.*, *Scott v. Schedler*, 771 F.3d 831, 838–39 (5th Cir. 2014) (finding Article III standing and noting Secretary was the chief election officer under the NVRA); *Harness v. Hosemann*, No. 17-CV-791, 2019 WL 8113392, at *3 (S.D. Miss. Aug. 7, 2019) (citing cases in noting that "while this civil action is not rooted in the NVRA, several courts have held that the designation of 'chief election officer' militates in favor of finding Article III standing in various election-law contexts"); *Voting for Am., Inc. v. Andrade*, 888 F. Supp. 2d 816, 828–29, 832 (S.D. Tex. 2012) (denying the Secretary's motion to dismiss for lack of standing and noting her

-1-

"argument is at odds with numerous cases in which plaintiffs have sued secretaries of state when challenging voter registration laws even though states commonly delegate voter registration responsibilities to county officials"), *rev'd on other grounds*, 732 F.3d 382 (5th Cir. 2013); *United States v. Texas*, 422 F. Supp. 917, 921 (S.D. Tex. 1976) (rejecting Secretary's motion to dismiss challenge to Texas election law, noting Secretary's duty to maintain uniformity of election laws). And the Fifth Circuit has made clear that the Secretary of the State of Texas is no exception: "The facial invalidity of a Texas election statute is, without question, fairly traceable to and redressable by the . . . Secretary of State, who serves as the 'chief election officer of the state.'" *OCA-Greater Houston v. Texas*, 867 F.3d 604, 613 (5th Cir. 2017)). Indeed, one member of the Eleventh Circuit panel explicitly acknowledged that the majority opinion was "directly contrary to the Fifth Circuit's holding in *OCA-Greater Houston*." *Jacobson*, 2020 WL 2049076, at *31 (Pryor, J., dissenting in part).[1] Because *OCA* is binding on the Court, the Eleventh Circuit's views on the matter, while interpreting a different state's election code, are irrelevant.[2]

---

[1] The Secretary's Notice cites Judge Pryor's partial dissent in support of her assertion that the Secretary of the State of Florida enjoys the same powers and responsibilities as the Texas Secretary but ignores the portion of that same discussion (indeed, the same paragraph) in which Judge Pryor acknowledges that the Eleventh Circuit's causation and redressability analysis breaks from Fifth Circuit precedent. *Jacobson*, 2020 WL 2049076, at *31 (Pryor, J., dissenting in part). Judge Pryor concluded that the majority's analysis "lacks any support in [Eleventh Circuit] precedent and conflicts with decisions from several other circuits." *Id.* at *33.

[2] The Fifth Circuit is not the only circuit court from which *Jacobson* parted. *See, e.g.*, *United States v. Missouri*, 535 F.3d 844, 846 n.1 (8th Cir. 2008) (finding Missouri's Secretary of State's broad responsibility to oversee the administration of elections made her the proper defendant in a challenge to an election law); *Harkless v. Brunner*, 545 F.3d 445, 451–52 (6th Cir. 2008) (same); *Ariz. Libertarian Party, Inc. v. Bayless*, 351 F.3d 1277, 1280–81 (9th Cir. 2003) (same); *see also Jacobson*, 2020 WL 2049076, at *31 (Pryor, J., concurring in part) (noting that the majority's holding that the harm was not caused or redressable by Florida's Secretary of State "creates a circuit split"); *id.* at *30 ("[W]hen confronted with cases in which defendant state officials carried out similar responsibilities with respect to challenged laws, our sister circuits have concluded that the officials were enforcing the law sufficiently to confer standing.").

In any event, the Secretary's reliance on *Jacobson* glosses over several key distinctions that strip away any plausible comparison here. *First*, the causation and redressability requirements do not pose any impediment to Plaintiffs' standing because this lawsuit challenges a "wet signature" rule *imposed by the Secretary* shortly before the November 2018 general election. Am. Comp. ¶ 18. Unlike the claims at issue in *Jacobson*, which challenged a provision of Florida law that determined the order in which candidate names are to appear on ballots, there is no question that the Secretary is responsible for imposing the wet signature rule and instructing local registrars to reject voter registration applications that did not comply. *Compare* Fla. Stat. § 99.121 (delegating to county Supervisors of Elections the task of printing candidates' names on the ballots), *with* Press Release, Texas Secretary of State, Secretary Pablos Reminds Texans To Exercise Caution When Registering To Vote (Oct. 4, 2018), https://www.sos.texas.gov/about/newsreleases/2018/100418.shtml (publicizing the wet signature rule). Because Plaintiffs challenge the Secretary's own conduct, the cessation of which would remedy at least some of their injuries, Article III's causation and redressability requirements are clearly satisfied. *See Bennett v. Spear*, 520 U.S. 154, 168–170 (1997) (finding injuries arising from a biological opinion issued by the Fish and Wildlife Service were traceable to and redressable by the Fish and Wildlife Service).[3]

---

[3] In this way, the better Florida analog to this case is *League of Women Voters of Florida, Inc. v. Detzner*, 314 F. Supp. 3d 1205, 1209 (N.D. Fla. 2018), which challenged an opinion issued by the Florida Secretary of State's office itself restricting early voting beyond that which Florida law permitted. In that case, the district court issued a preliminary injunction prohibiting the Secretary from enforcing his restrictive interpretation of the law and requiring the Secretary to advise local elections officials of the same, *see id*. at 1225; as a result, over 60,000 Floridians were able to cast ballots at early voting locations that otherwise never would have been opened. Thus, not only was the district court there correct to reject the Secretary's similar standing arguments (which the court described as a "head-scratcher," *League of Women Voters of Florida, Inc. v. Detzner*, 354 F. Supp. 3d 1280, 1285 (N.D. Fla. 2018)), the results of the imposition of the

*Second*, the court's analysis in *Jacobson* rested on unique features of Florida law: namely, the court found that the only means of control the Florida Secretary has over Supervisors of Elections is through the judicial process. *Jacobson*, 2020 WL 2049076, at *10. Putting aside the fact that, here, too, *Jacobson* is an outlier, with multiple other circuits having found such enforcement powers more than sufficient for Article III purposes, *see, e.g.*, *Citizens for Equal Prot. v. Bruning*, 455 F.3d 859, 864 (8th Cir. 2006) (holding that where state actors had ability to file suit to enforce challenged law, suit "satisfies the case or controversy requirement of Article III") (abrogated on other grounds by *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015)), under Texas law, the Secretary has *additional* powers that only serve to underscore why this action is proper. Texas law, for example, gives the Secretary the authority to "take appropriate action to protect the voting rights of the citizens of this state from abuse by the authorities administering the state's electoral processes," to "order" local officials to "correct the offending conduct," and to seek enforcement for failure to comply. TEX. ELEC. CODE ANN. § 31.005 (West 2020). The fact that county election officials play *some* role in redressing Plaintiffs' asserted injuries does not defeat Article III standing. Even when harm depends on actions of third parties, Article III is satisfied when the defendant's action has a "predictable effect" on those third parties. *See, e.g.*, *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019) (finding harm was traceable to the Department of Commerce even though it depended on noncitizens violating their legal duty to respond to the census because noncitizens "will likely to react in predictable ways to the citizenship question"); *Fla. State Conference of the NAACP v. Browning*, 522 F.3d 1153, 1157, 1159 n.9, 1184 n.22 (11

---

preliminary injunction *proved* the Secretary's assertions about redressability and traceability to be false. That case was later resolved by settlement. *See* Bobby Caina Calvan, *Settlement reached in Florida dispute over college voting*, THE GAINESVILLE SUN (Apr. 3, 2020), https://www.gainesville.com/news/20200403/settlement-reached-in-florida-dispute-over-college-voting.

Cir. 2008) (holding plaintiffs' injuries stemming from voter registration statute's matching requirement were traceable to and redressable by Secretary, even where non-party supervisors of elections were responsible for reviewing and curing mismatches); *see also Texas v. United States*, 945 F.3d 355, 387 (5th Cir. 2019), *cert. granted sub nom. Texas v. California*, 140 S. Ct. 1262 (2020) (finding an order invalidating the Affordable Care Act's individual mandate would redress the administrative burden imposed on states by the Affordable Care Act's reporting requirements, which are only triggered if state employees buy health insurance through the state, because the individual mandate "predictably causes more people to buy insurance"). Here, we do not have to predict how county election officials respond to the Secretary's directives regarding the wet signature rule. We know. After the Secretary publicized the wet signature rule five days before the registration deadline leading up to the 2018 general election, county election officials reversed course and rejected applications on that basis. Am. Compl. ¶¶ 19–20. To suggest that decisions of local officials are out of the Secretary's control is factually and legally incorrect.

The *Jacobson* court's discussion on associational standing also does nothing to advance Secretary Hughs's Motion because the Plaintiffs in this case plainly allege that they have members or constituents who are injured by the wet signature rule. Am. Compl. ¶ 8 ("TDP has millions of members and constituents from across the State, including Texans who regularly support candidates affiliated with the Democratic Party, and will register to vote in upcoming elections."); *id.* ¶ 14 ("DCCC [has] constituents who are required to register in order to vote in the upcoming 2020 elections, and some of whom have had their voter registration applications with imaged signatures rejected in the past, and must now incur the additional burden and expense of complying with the wet signature rule."). The Eleventh Circuit, notably, did not endorse the Secretary's novel theory that injured members must be identified by name in the complaint, and instead grounded

its ruling on the sufficiency of evidence presented *at trial*. *Jacobson*, 2020 WL 2049076, at *8. The Secretary's Motion failed to appreciate this distinction—between the allegations that establish standing on one hand, and evidence that proves it at trial, on the other—and her Notice of Supplemental Authority commits the same error. *Jacobson* made no findings regarding the adequacy of the plaintiffs' membership *allegations*, which is the sole question before this Court at the Motion to Dismiss stage.

The same error carries over to the Secretary's discussion of organizational standing, which, again, misapplies *Jacobson*'s assessment of the evidence presented at trial to the significantly less stringent pleading requirements that govern Plaintiffs' complaint. *Id.* at *9. Each plaintiff has explained in detail its ongoing voter registration efforts and alleged that the wet signature rule will increase the cost of these programs, requiring them to divert resources from programs in other states and voter persuasion activities in Texas. Am. Compl. ¶ 9 ("[B]ecause the wet signature rule prevents voters from signing their voter registration forms electronically or with an imaged signature, TDP must expend additional resources to ensure that voters receive and sign a hard copy of their completed applications, and, in many cases, deliver stamped, addressed envelopes which voters can use to mail their applications to their county registrars."); *id.* ¶ 11 ("DSCC . . . will have to expend and divert additional funds and resources to ensure that eligible citizens are registered to vote in order to support its mission, at the expense of its other voter persuasion activities in Texas, as well as its efforts in other states."); ¶ 14 ("Because of the wet signature rule, DCCC will be forced to expend more resources, and divert funds from other critical priorities as well as its programs in other states, in order to accomplish its goal of significantly increasing voter registration and turnout in Texas."). Neither *Jacobson* nor any other authorities the Secretary cites requires Plaintiffs to trace the diversion of resources from one specific activity or expense to the

next in the complaint. Indeed, such a finding would run directly contrary to the holding by the U.S. Supreme Court in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), which found "[i]f, *as broadly alleged*," the defendant's practices "have *perceptibly impaired*" plaintiffs' mission, "there can be no question that the organization has suffered injury in fact." (emphases added).

Finally, while it is no secret that Democratic party organizations and committees aim to elect Democrats, the Secretary continues to mischaracterize the Amended Complaint by suggesting that Plaintiffs have only alleged an impairment of electoral prospects with no additional injury or factual support. To the contrary, the Amended Complaint describes in detail how each Plaintiff has embarked on a voter registration program, and a law that makes it harder and costlier to register voters—and to accomplish their voter registration goals—unquestionably injures all Plaintiffs. Am. Compl. ¶¶ 8–14. The Fifth Circuit has explicitly found such allegations sufficient to support Article III standing in cases brought by political party entities in circumstances meaningfully indistinguishable from this case. *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006) (finding that Texas Democratic Party had direct standing because "would need to raise and expend additional funds and resources to prepare a new and different campaign"). But even if Plaintiffs relied entirely on the injury to their favored candidates' electoral prospects, such harm is also enough to demonstrate standing under the Fifth Circuit's jurisprudence. *Jacobson*, 2020 WL 2049076, at *9 (citing *Benkiser*, 459 F.3d at 586).[4] It is also sufficient in at least six other circuits. *See Green Party of Tenn. v. Hargett*, 767 F.3d 533, 543–44 (6th Cir. 2014); *LaRoque*

---

[4] In *Benkiser* the Fifth Circuit noted that "[v]oluminous persuasive authority" similarly holds that a threat to a party's electoral prospects is sufficient to confer standing. 459 F.3d at 587 & n.4 (*citing Smith v. Boyle*, 144 F.3d 1060, 1061–63 (7th Cir. 1998); *Schulz v. Williams*, 44 F.3d 48, 53 (2d Cir.1994); *Owen v. Mulligan*, 640 F.2d 1130, 1132–33 (9th Cir. 1981); *Democratic Party of the United States v. Nat'l Conservative Political Action Comm.*, 578 F. Supp. 797, 810 (E.D. Pa. 1983); and *Bay Cty. Democratic Party v. Land*, 347 F. Supp. 2d 404, 423 (E.D. Mich. 2004)).

*v. Holder*, 650 F.3d 777, 786 (D.C. Cir. 2011); *Smith*, 144 F.3d at 1061–63; *Schulz*, 44 F.3d at 53; *Owen*, 640 F.2d at 1132–33; *Schiaffo v. Helstoski*, 492 F.2d 413, 417 (3d Cir. 1974).

In sum, the Eleventh Circuit's reasoning in *Jacobson* is neither applicable nor instructive in this case. *Jacobson* addresses factually dissimilar claims at a different stage of litigation, which implicates different legal standards. Most importantly, as even the *Jacobson* court acknowledged, the Eleventh Circuit's decision breaks from Fifth Circuit precedent, and only the latter is binding in this Court. Accordingly, the Secretary's Notice provides no additional support for her position that the Court should dismiss this case for lack of subject matter jurisdiction.

Dated: May 21, 2020                                    Respectfully submitted,

                                                       */s/ Skyler M. Howton*
                                                       Marc E. Elias*
Chad W. Dunn                                           Uzoma Nkwonta*
TX State Bar No. 24036507                              Emily Brailey*
Brazil & Dunn, LLP                                     Stephanie Command*
4407 Bee Caves Road, Suite 111                         PERKINS COIE LLP
Austin, Texas 78746                                    700 Thirteenth St., N.W., Suite 600
Telephone: (512) 717-9822                              Washington, D.C. 20005-3960
Facsimile: (512) 515-9355                              Telephone: (202) 654-6200
chad@brazilanddunn.com                                 Facsimile: (202) 654-9959
                                                       melias@perkinscoie.com
*Counsel for Plaintiff Texas*                          unkwonta@perkinscoie.com
*Democratic Party*                                     ebrailey@perkinscoie.com
                                                       scommand@perkinscoie.com

                                                       Skyler M. Howton
                                                       TX State Bar No. 24077907
                                                       PERKINS COIE LLP
                                                       500 N. Akard St., Suite 3300
                                                       Dallas, TX 75201
                                                       Telephone: (214) 965-7700
                                                       Facsimile: (214) 965-7799
                                                       showton@perkinscoie.com

                                                       *Counsel for the Plaintiffs*

                                                       *Admitted Pro Hac Vice

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 21, 2020, I electronically served the foregoing via ECF on all counsel of record.

/s/ *Skyler M. Howton*
Skyler M. Howton