UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

**FILED**

JUL 2 2 2020

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

| | | |
|---|---|---|
| TEXAS DEMOCRATIC PARTY, | ) | |
| DSCC, and DCCC | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| | ) | |
| v. | ) | CIVIL NO. SA-20-CV-08-OG |
| | ) | |
| RUTH R. HUGHS, in her official | ) | |
| capacity as Texas Secretary of State | ) | |
| | ) | |
| Defendant | ) | |

## ORDER

Pending before the Court is Defendant's motion to dismiss. Docket nos. 13, 17, 20.

Plaintiffs have filed a response. Docket nos. 14, 21. The Court has reviewed the amended

complaint, the briefs, and the applicable law, and finds that Defendant's motion should be

denied.

I.

### Statement of the case

In this case, Plaintiffs challenge the Secretary of State's conduct in rejecting or instructing

others to reject voter registration signatures on the pretense that they are not wet signatures.

Plaintiffs allege this arbitrary, disparate conduct violates § 1971 of the Civil Rights Act of 1964,

52 U.S.C. § 10101(a)(2)(B); the First Amendment and the Equal Protection Clause of the

Fourteenth Amendment, U.S. CONST. Amend. I, XIV § 1; and §§ 13.002(a) and 13.143(d-2) of

the Texas Election Code. Plaintiffs assert their claims under 42 U.S.C. § 1983, and seek

declaratory and injunctive relief.

1

II.

Standards of review

Defendant has filed her motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and (6). In ruling on a Rule 12(b)(1) motion, the court may consider: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint, undisputed facts, and the court's resolution of disputed facts. *Spotts v. United States*, 613 F.3d 559, 566 (5th Cir. 2010). The trial court is "free to weigh the evidence and satisfy itself" that subject matter jurisdiction exists. *MDPhysicians & Assocs., Inc. v. State Bd. of Ins.*, 957 F.2d 178, 181 (5th Cir. 1992) (quoting *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)). When a Rule 12(b)(1) motion is filed in conjunction with other motions under Rule 12, the court should consider the Rule 12(b)(1) jurisdictional challenge before addressing other challenges. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

Rule 12(b)(6) allows a court to dismiss an action when the complaint fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding such a motion, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotation marks omitted). The Supreme Court has explained that a complaint must contain sufficient factual matter "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678. The court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and

2

referenced by the complaint. *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

## III.

### Eleventh Amendment immunity and Article III standing

A.    *Ex parte young* applies

Defendant first argues that sovereign immunity bars the instant claims because the *Ex parte Young* exception to Eleventh Amendment immunity does not apply. Having reviewed the amended complaint and the applicable law, the Court disagrees. "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry in whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md, Inc. v. Pub. Serv. Com'n of Md.*, 535 U.S. 635, 122 S.Ct. 1753, 1760 (2002). In examining the complaint, the Court looks at whether the state official in question "has some connection" with the enforcement in question and there is a threat to exercise that authority. *Air Evac EMS, Inc. v. Tex. Dep't. of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 517-519 (5th Cir. 2017).

A fair reading of the instant complaint,[1] in context, reflects a claim that the Texas Secretary of State has instituted and enforced a rule that arbitrarily invalidates voter registration signatures that are not wet ink signatures; such signatures have been and will continue to be rejected under the Secretary's guidance; and the Secretary has been and will continue to enforce a rule or policy unsupported by state law and in violation of federal law. Plaintiffs also assert that although the Secretary claims to be acting pursuant to state law, she has misinterpreted and misapplied the law because there is no state authority which requires wet ink signatures and, in

---

[1] Docket no. 12.

3

fact, state law dictates otherwise. Plaintiffs further argue that even if state law does impose such a rule, which they dispute, the rule is unconstitutional and the Secretary's enforcement thereof violates federal law. Plaintiffs seek both declaratory and prospective injunctive relief. This is exactly the type of claim that falls under *Ex parte Young. See Florida Dept. of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 102 S.Ct. 3304, 3321 (1982) ("If conduct of a state officer taken pursuant to unconstitutional state statute is deemed to be unauthorized and may be challenged in federal court, conduct undertaken without any authority whatever is also not entitled to Eleventh Amendment immunity"); *Air Evac EMS*, 851 F.3d at 519 (plaintiffs establish an official's connection to the enforcement when the official effectively ensures the scheme is enforced or engages in action that constrains the plaintiffs); *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019) (if an official can act, and there's a significant possibility that he or she will, the official has engaged in enough compulsion or constraint to apply the *ex parte Young* exception).

B.      The Secretary's authority/role

The Secretary of State further claims that she "neither handles voter applications herself nor controls the local officials who do" and thus Plaintiffs do not have Article III standing to sue her. Docket no. 13, pp. 2-5. This argument is a nonstarter. As chief election officer, the Secretary of State has the duty and authority to maintain uniformity in the application, operation, and interpretation of state election laws, which includes directing, instructing, and ordering local election officials, prescribing statewide procedures, and protecting Texans' voting rights. TEX. ELEC. CODE ANN. §§ 31.001(a), 31.003, 31.005, 31.016 (West 2020); *Tex. Democratic Party v. Abbott*, 2020 WL 2982937, at *6 (5th Cir. June 4, 2020); Op. Atty. Gen. KP-009 (March 9, 2015) ("The Texas Secretary of State (SOS) is the entity tasked with administering [and] applying [the Texas election laws]"). As alleged in the amended complaint, the Secretary of State

4

not only *has* the authority but has *exercised* that authority by instituting and enforcing a wet

signature rule that arbitrarily rejects signatures on voter registration applications. The exercise of

such authority, and the continued threat to exercise such authority, gives rise to the claims herein.

Plaintiffs allege that the Secretary of State's exercise of authority by imposing this rule is not

only reflected in statements and press releases, but is also the unequivocal position the Secretary

has taken in *Stringer v. Pablos*, 320 F. Supp. 3d 862, 874-875 (W.D. Tex. 2018), *rev'd and

remanded sub nom on other grounds, Stringer v. Whitley*, 942 F.3d 715 (5th Cir. 2019) (*Stringer

I*). Notably, in the *Stringer* litigation, the Secretary has never claimed to lack authority or control

over the validity, acceptance, or rejection of voter registration signatures. In fact, the Secretary

has not allowed certain electronic signatures to ever reach local registrars.[2] Plaintiffs have

asserted concrete, particularized, impending injuries which are fairly traceable to the challenged

action of the Secretary of State and redressable by a favorable ruling. *Friends of the Earth, Inc. v.

Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 120 S. Ct. 693, 704 (2000) (citing *Lujan v.

Defenders of Wildlife*, 504 U.S. 555, 560-561, 112 S. Ct. 2130 (1992)); *OCA-Greater Houston v.

Texas*, 867 F.3d 604, 613 (5th Cir. 2017).

C.      Organizational and Associational standing

        In a lawsuit for injunctive relief, the presence of one party with standing is sufficient to

satisfy Article III's case or controversy requirement. *Rumsfield v. Forum for Acad. &

Institutional Rights, Inc.*, 547 U.S. 47, 52 n. 2 (2006); *Texas v. United States*, 945 F.3d 355, 377-

378 (5th Cir. 2019). Moreover, "the injury alleged as an Article III injury-in-fact need not be

substantial; 'it need not measure more than an 'identifiable trifle,' . . . [t]his is because 'the

---

[2]The Court notes that *Stringer II* is currently pending, but the Secretary has never claimed to lack
authority over the rejection of voter signatures in either *Stringer I* or *Stringer II.*

[requirement] under Article III is qualitative, not quantitative, in nature." *OCA-Greater Houston*, 867 F.3d at 612 (citing *Ass'n of Cmty Orgs. For Reform Now v. Flowler*, 178 F.3d 350, 358 (5th Cir. 1999)). With this in mind, the Court considers Defendant's challenge to the standing of each plaintiff.

      1.    Organizational standing

Plaintiffs assert that they have direct organizational standing because the Secretary's conduct in imposing and enforcing a wet signature rule impairs their mission of electing Democrats to the U.S. Senate, U.S. House of Representatives, and Democratic offices throughout Texas and requires Plaintiffs to divert significant resources to their voter registration activities in order to counteract the unconstitutional burdens imposed by the rule. Importantly, the unconstitutional burden that Plaintiffs complain of is the conduct of the Secretary of State in imposing and enforcing a wet signature rule. Defendant's argument that "section 13.002 does not cause cognizable injury" ignores the true nature of the claims stated in the amended complaint. As Plaintiffs note in their response, "by referring generally to a signature requirement on registration applications [under section 13.002], [the Secretary is] sidestepping the fact that her directive requires a *wet ink* signature – an entirely new restriction on voter registration that Plaintiffs challenge here." Docket no. 14, p. 17. Defendant's argument also goes to the merits, rather than Plaintiffs' standing. The Secretary made a similar argument in *OCA-Greater Houston*, which the Fifth Circuit dismissed out of hand, explaining that this type of "circular argument misses the mark. . . . [m]ore importantly, the argument conflates the merits of the suit with the plaintiff's standing to bring it. . . . Texas cannot defeat standing by arguing that the statute is facially valid, just misapplied by county officials – a merits question that we may reach only when satisfied that OCA has standing." 867 F.3d at 613.

Organizational standing does not depend on the standing of the organization's members. The organization itself can establish standing "in its own name" if it meets the same standing test that applies to individuals. *OCA-Greater Houston*, 867 F.3d at 610. In *OCA-Greater Houston*, the plaintiff established standing on facts similar to those alleged herein. OCA's alleged injury-in-fact was the additional time and effort spent explaining the Texas restrictions on interpreters and assistors, which frustrated and complicated its routine voter outreach activities. The Fifth Circuit held that spending extra time and money to educate voters about Texas restrictions and how to avoid their negative effects is, in fact, an Article III injury. *Id.* Similarly, Plaintiffs herein allege that their mission is to elect Democrats in Texas and to accomplish this mission they work to mobilize voters to register and turn out. The Secretary's wet signature restriction frustrates their mission and results in the expenditure of additional resources to assist Texans in getting registered to vote under restrictive rules while trying to avoid having their registration forms rejected as a result of the Secretary's directive. Docket no. 12, ¶ 8-14.

> Specifically, the TDP alleges, *inter alia*:
>
> [B]ecause the wet signature rule prevents voters from signing their voter registration form electronically or with an imaged signature, TDP must expend additional resources to ensure that voters receive and sign a hard copy of their completed applications, and, in many cases, deliver stamped, addressed envelopes which voters can use to mail their applications to their county registrars.
>
> Defendant's conduct directly harms TDP by imposing burdens and costs that limit the effectiveness of its voter registration program and make it more difficult for TDP to reach its registration goals and accomplish its mission of electing Democrats in Texas. Because of the wet signature rule, TDP will be forced to expend more resources, and divert funds from other critical priorities, in order to assist voters in completing the registration process and increase turnout.

Docket no. 12, ¶ 8-10. Likewise, the DCCC alleges it is currently engaged in a campaign to boost voter turnout, which includes a canvassing program to expand registration in Texas. DCCC "will need to give significant sums to the TDP to spend on its field program, which includes voter

registration efforts." Although DCCC typically relies on online tools, the Secretary's wet

signature rule "limits the reach of DCCC's campaign" . . . and requires DCCC "to collect and

mail hand-signed application forms from voters, or assist voters in submitting the hand-signed

forms directly to county registrars. Defendant's conduct directly harms DCCC by limiting the

effectiveness of its voter registration campaign and canvassing efforts and frustrates DCCC's

efforts to elect Democratic Party candidates from Texas to the U.S. Congress. Because of the wet

signature rule, DCCC will be forced to expend more resources, and divert funds from other

critical priorities as well as its programs in other states, in order to accomplish its goal of

significantly increasing voter registration and turnout in Texas." Docket no. 12, ¶ 12-14. And the

DSCC also alleges that as a result of the Secretary's "unlawful restrictions on voter registration

application signatures, [it] will have to expend and divert additional funds and resources to

ensure that eligible citizens are registered to vote in order to support its mission, at the expense of

its other voter persuasion activities in Texas, as well as its efforts in other states." Docket no. 12,

¶ 11.

All Plaintiffs have asserted enough "qualititative" facts – more than an "identifiable

trifle" – to establish direct organizational standing. *See OCA-Greater Houston*, 867 F.3d at 610

(spending extra time and money and reaching fewer people because of the restriction is injury-in-

fact); *Texas Democratic Party v. Benkiser*, 459 F.3d 582, 586-587 (5th Cir. 2006) (expending

additional funds and resources and threatened loss of political power are sufficient injuries for

standing purposes).

    2.    Associational standing

The Court is also satisfied at this juncture that Plaintiffs have alleged sufficient facts to

establish associational standing on behalf of their members. An association has standing to bring

suit on behalf of its members when its members would otherwise have standing to sue in their own right; the interests it seeks to protect are germane to the organization's purpose; and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Washington State Apple Adver. Comm'n.*, 432 U.S. 333, 343, 97 S. Ct. 2434 (1977); *see Crawford v. Marion County Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) ("The Democratic Party also has standing to assert the rights of those of its members who will be prevented from voting by the new [restriction]."), *aff'd*, 553 U.S. 181, 128 S.Ct. 1610 (2008); *see Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565, 573-574 (6th Cir. 2004) (the Democratic party organizations had standing "to assert, at least, the rights of their members who will vote"); *see also Bensiker*, 459 F.3d at 587 (finding that the TDP had associational standing). There is no requirement that the association name each member in its complaint in order to survive a Rule 12(b)(1) motion. *Hancock Cty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189, 198 (5th Cir. 2012).

Each of the plaintiffs' members who are currently or will be registering to vote would have standing to sue in their own right. Plaintiffs have asserted that after inventing the wet signature rule, Secretary of State began enforcing it by invalidating or instructing, directing, or guiding others to invalidate voter registration signatures because they were not "wet signatures."[3] Plaintiffs further allege, and Defendant does not dispute, that the Secretary has not in any way retracted the rule; instead, she has evidenced an intent to continue enforcing the rule and this conduct continues unabated. Thus, as the organizations' members continue to register to vote, each of them are or will be restrained by this rule, which allegedly violates their constitutional

---

[3] Even worse, the Secretary allegedly invalidated or instructed others to invalidate many voter registration applications on the eve of the election, leaving them with no time (or insufficient time) to resubmit their registration in accordance with her wet signature rule. Those who were able to resubmit their application incurred "the additional burden and expense of complying with the wet signature rule."

and statutory rights under federal law. Moreover, the interests that Plaintiffs seek to protect are

germane to their purpose of electing Democrats to the U.S. Senate, U.S. House of

Representatives, and Democratic offices throughout Texas and nothing requires the participation

of each member when their interests are fully represented by the organizations. Any relief granted

herein will inure to the members' benefit. Plaintiffs have Article III standing to sue the Secretary

of State for the relief sought herein.

IV.

A private right of action

A.     Implied right of action

Defendant asserts that Plaintiffs cannot bring a private right of action for alleged

violations of section 1971 of the Civil Rights Act, 52 U.S.C. § 10101(a)(2)(B) (the "Materiality

Provision"). This provision prohibits the practice of disqualifying voters "because of an error or

omission on any record or paper relating to any application, registration, or other act requisite to

voting, if such error or omission is not material to determining whether such individual is

qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B). Section 10101

has its origins in Section 1 of the Act of May 31, 1870, ch. 114, 16 Stat. 140, 140-42 (1870). The

Act was partially appealed, 28 Stat. 36 (1894), but Section 1 of the Act was not repealed. The

Act was initially codified as Rev. Stat. § 2004, and then recodified (as amended) at 8 U.S.C. §

31, then (as amended) at 42 U.S.C. § 1971, and finally at 52 U.S.C. § 10101. Private rights of

action were recognized under the statute long before the 1957 amendment that *added* the

provision which *also* allows the Attorney General to bring an enforcement action. *See, e.g., Smith

v. Allwright*, 321 U.S. 649, 651 (1944); *Chapman v. King*, 154 F.2d 460, 461 (5th Cir. 1946);

*Mitchell v. Wright*, 154 F.2d 924, 925 n.1 (5th Cir. 1946). The 1957 amendment was proposed

10

because enforcement purely by private parties was not enough, and the intent was to make

enforcement stronger without taking anything away. The Attorney General at that time

introduced the legislation and testified before Congress that the additional enforcement provision

would not impair the ability of private individuals to bring suit under the Act. Specifically, he

testified "We are not taking away the right of the individual to start his own action. . . . Under the

laws amended if this program passes, private people will retain the right they have now to sue in

their own name." *Civil Rights Act of 1957: Hearings on S. 83, an amendment to S.83, S. 427, S.*

*428, S. 429, S. 468, S. 500, S. 501, S. 502, S. 504, S. 505, S. 508, S. 509, S. 510, S. Con. Res. 5*

*Before the Subcomm. on Constitutional Rights of the Senate Comm. on the Judiciary*, 85th Cong.

73, 203, 1; 60-61, 67-73 (1957) (statement and testimony of the Hon. Herbert Brownell, Jr.,

Attorney General of the United States). After the 1957 amendment adding the option of

enforcement actions by the Attorney General (now subsection c), private plaintiffs continued to

bring their own causes of action under other provisions of the Act, including the Materiality

Provision of 1964. *Schwier v. Cox*, 340 F.3d 1284, 1294-1297 (11th Cir. 2003) (rejecting

identical arguments of Secretary of State and recognizing that violations under 42 U.S.C. §

1971(a)(2)(B) may be enforced by a private right of action brought under § 1983); *Taylor v.*

*Howe*, 225 F.3d 993, 996 (8th Cir. 2000) (private cause of action under 42 U.S.C. § 1983 for

violations of 42 U.S.C. § 1971(a)(2)(B) and the Fourteenth and Fifteenth Amendments); *Coal.*

*for Educ. in Dist. One v. Bd. of Elections*, 495 F.2d 1090, 1091 (2d Cir. 1974) (private cause of

action under 42 U.S.C. § 1971 for Equal Protection violations); *Bell v. Southwell*, 376 F.2d 659,

660 (5th Cir. 1967) (private cause of action under 42 U.S.C. §§ 1971, 1983); *Reddix v. Lucky*,

252 F.2d 930, 933-934 (5th Cir. 1958) (private cause of action under 42 U.S.C. §§ 1971, 1983);

*Common Cause/Georgia v. Billups*, 406 F. Supp. 2d 1326, 1370-1372 (N.D. Ga. 2005) (rejecting

arguments that private right of action did not exist and recognizing claim under 42 U.S.C. § 1971(a)(2)(B)).

There is no reason to shield the type of violations at issue herein from the reach of private litigants. Neither the U.S. Supreme Court nor the Fifth Circuit prohibit bringing a private cause of action; many courts have recognized a private right of action; and Congress did not intend to foreclose private causes of action by *also* granting the Attorney General enforcement authority.[4] Defendant's reliance on *Alexander v. Sandoval*, 532 U.S. 275, 121 S. Ct. 1511 (2001) is misplaced. The Court in *Sandoval* held that § 602 of Title VI the Civil Rights Act of 1964 did not imply a private right of action because its enforcement powers (against federal funding of programs with racially disparate impact) were conferred only on federal agencies engaged in the distribution of public funds. *Sandoval*, 532 U.S. at 289 ("this authorizing portion of § 602 reveals no congressional intent to create a private right of action). Importantly, however, § 601 *did* provide a private right of action. *Id.* at 279 ("private individuals may sue to enforce § 601 of Title VI and obtain both injunctive relief and damages"). The fact that § 602 was limited to the Attorney General's enforcement authority did not preclude a private right of action under § 601, or vice versa. The same distinction applies here. The fact that subsection (c) gives the Attorney General authority to bring an enforcement action does not mean that private actions under the statute's other provisions are not available.

The *Schwier* case is directly on point. In that case, the Georgia Secretary of State made the identical argument being asserted herein. The Eleventh Circuit, after thorough analysis, rejected the Secretary's argument and held that a private right of action existed *before* the

---

[4]In *Veasey v. Perry*, 29 F. Supp. 3d 896, 905-907 (S.D. Tex. 2014), the State's failed argument – that organizations could not bring a Section 2 challenge to the voter ID law because *only* the Attorney General had the necessary enforcement powers – was based on the same flawed reasoning.

Attorney General was granted authority to bring suit, and a private right of action continued to exist *after* the Attorney General was granted such authority. Congress did not mean to merely "substitute one form of protection for another." *Schwier*, 340 F.3d at 1294-1297. Subsection (d) of the statute provides that "[t]he district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this section and shall exercise the same without regard to whether 'the party aggrieved' shall have exhausted any administrative or other remedies that may be provided by law." 52 U.S.C. § 10101(d). The "party aggrieved" is universally understood to mean the persons whose rights are being violated, not the Attorney General. *See Schwier*, 340 F.3d at 1296 ("Appellants argue that this language could not have applied to the Attorney General and thus was meant to 'remove [ ] roadblocks for the previously authorized private rights of action under § 1971.' We agree.").

The weight of relevant authority supports the conclusion that Plaintiffs have a private right of action to sue for violations under 52 U.S.C. § 10101(a)(2)(B).

B.      Right of action under § 1983

Plaintiffs assert that even if they did not have a private right of action to sue directly under 52 U.S.C. § 10101(a)(2)(B), which they do not concede, they may also bring their claim under 42 U.S.C. § 1983, which provides a civil remedy for the deprivation of rights secured by the Constitution *and laws* of the United States. But Defendant argues that Plaintiffs do not have standing to sue for "third parties" under Section 1983. This argument is unavailing. The same facts that establish organizational and associational standing, discussed *supra*, also demonstrate standing to sue for voting rights violations under 52 U.S.C. § 10101(a)(2)(B), using 42 U.S.C. § 1983 as a vehicle for remedial relief. *See Schwier*, 340 F.3d at 1297 ("we hold that the provisions of section 1971 of the Voting Rights Act may be enforced by a private right of action under

13

1983"); *see also Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 551

(5th Cir. 2010) (association had standing to assert § 1983 claims on behalf of members in

seeking prospective declaratory and injunctive relief); *see also Veasey*, 29 F. Supp. 3d at 907

("Defendants argument that the other statutory claims asserted here – under the Civil Rights Act,

42 U.S.C. § 1983 and the Declaratory Judgments Act, 28 U.S.C. § 2201 – also inure only to the

benefit of the party injured and cannot support third-party standing. The Court has rejected the

application of third-party standing to the organizational parties here. . . . This is not a third-party

standing case as to the organizations."). Plaintiffs are entitled to seek relief under § 1983, on

behalf of themselves and their members, for alleged violations of 52 U.S.C. § 10101(a)(2)(B).

The Secretary also argues that Plaintiffs have "intentionally waived" their right to sue

under Section 1983 for any violation of 52 U.S.C. § 10101(a)(2)(B) by not clearly pleading it.

This case is at the pleadings stage, not on appeal, and waiver is not a valid argument. In any

event, Plaintiffs may amend their complaint to clarify this issue.

V.

Stating a claim

The remainder of Defendant's motion, brought under Rule 12(b)(6), is improperly

focused on the merits of the claims, rather than the sufficiency of the complaint, and thus will not

be considered at this juncture of the proceedings. The Secretary asserts, *inter alia*, that "section

13.002 is constitutional" and proceeds to explain why the State's interests outweigh the burden

imposed on Plaintiffs and their members; that "section 13.002 is not discriminatory" because it

"survives rational basis review"; that Plaintiffs do not have a substantive due process claim

because they do not rely on "good law"; and "[i]n any event, the Secretary has not violated" the

law. Docket no. 13, ¶ IV A-C. These arguments ignore the true nature of the claims stated in the

amended complaint; sidestep the Secretary's role in enforcing the wet signature rule; and prematurely focus on interests and burdens that cannot be assessed much less weighed until after discovery on the merits.

For these reasons, the Secretary of State's motion to dismiss (docket no. 13) is DENIED. Plaintiffs may amend their current complaint within ten days from the date below solely for the purpose of clarifying that they are seeking relief under § 1983 for alleged violations of 52 U.S.C. § 10101(a)(2)(B). Because this will be the only amendment and it has already been addressed, Defendant's answer will be due within ten days after the filing of the second amended complaint. The parties must hold their Rule 26(f) conference, exchange their Rule 26(a) mandatory disclosures, and submit a proposed scheduling order within 30 days after the filing of the answer.

SIGNED this _22_ day of July, 2020.

_____
ORLANDO L. GARCIA
CHIEF U.S. DISTRICT JUDGE