**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | |
|---|---|
| TEXAS DEMOCRATIC PARTY; DSCC; DCCC, <br><br> Plaintiffs, <br><br> v. <br><br> RUTH R. HUGHS, in her official capacity as the Texas Secretary of State, <br><br> Defendant. | Civil Action No. 5:20-cv-00008-OLG <br><br><br> Related to *Stringer v. Cascos*, No. 5:16-cv-00257-OLG |

## SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, Texas Democratic Party ("TDP"), DSCC, and DCCC, file this Second Amended

Complaint for Declaratory and Injunctive Relief against Defendant RUTH R. HUGHS, in her

official capacity as the Texas Secretary of State, and allege as follows:

### NATURE OF THE ACTION

1.      Five days before the voter registration deadline for the 2018 midterm election, the

Texas Secretary of State instructed county registrars to reject over 2,400 voter registration

applications that were collected and submitted by a third-party organization in connection with its

efforts to expand voter participation and increase turnout in Texas.[1] The Secretary claimed that the

applications were incomplete because they lacked an original, wet signature (the "wet signature

---

[1] *See* Press Release, Texas Secretary of State, Secretary Pablos Reminds Texans To Exercise Caution When Registering To Vote (Oct. 4, 2018) (available at https://www.sos.texas.gov/about/newsreleases/2018/100418.shtml); *see also* Jackie Wang, *Secretary of State: Signatures of Texans who Registered on Vote.org are Invalid*, The Rivard Report (Oct. 4, 2018), https://therivardreport.com/secretary-of-state-signatures-of-texans-who-registered-on-vote-org-are-invalid/.

rule"), despite the fact that Texas law makes no reference to wet signatures and permits voters to register by faxing, and then mailing, "a copy" of their voter registration application to their county registrar. TEX. ELEC. CODE §§ 13.002(a), 13.143(d-2). Consistent with the Secretary's guidance, county registrars left thousands of Texas voters scrambling to register to vote before the midterm elections, and many were unable to do so.

2.      The decision to reject these applications not only misapplies the Texas Election Code, but also contradicts the State's longstanding recognition that electronic signatures carry the force of law. *See, e.g.*, TEX. BUS. & COM. CODE § 322.007 ("If a law requires a record to be in writing, an electronic record satisfies the law."). In fact, the Secretary of State's Office already accepts electronic signatures on some voter registration applications submitted through state agencies. Voters who renew their licenses or change their addresses at the Texas Department of Public Safety ("DPS"), for instance, can enter their signatures on electronic keypads; these signatures are then stored electronically, which allows Texas DPS officials to piece together a voter registration application by combining personal information populated from the renewal or change of address forms, and the voter's signature from the electronic file. This information, once compiled, becomes the voter's registration application and is approved if the applicant meets the eligibility requirements.

3.      The ability to complete and sign applications electronically significantly expands registration opportunities for many voters who may have limited access to mailing facilities or who otherwise need assistance to register. In providing such assistance, organizations like Plaintiffs can facilitate the transmission of electronically-signed applications to the county registrar, rather than collecting hand-signed copies from each individual voter, and as a result can reach many more voters throughout the State. The wet signature rule, however, imposes an

arbitrary requirement that limits access to the franchise and forces organizations like Plaintiffs to expend additional resources in order to assist potential registrants in complying with antiquated, bureaucratic rules that serve no legitimate State interest. Thus, even if the wet signature rule had any basis in Texas law (though it does not), it violates the federal Constitution and the Civil Rights Act by selectively targeting and burdening private organizations' efforts to increase voter turnout, and imposing an arbitrary barrier to registration that has already denied many Texans the opportunity to vote for reasons entirely unrelated to their eligibility.

4.        Absent an injunction, the wet signature rule will not only burden the right to vote, but it will also undermine Plaintiffs' missions by imposing additional costs on, and limiting the reach of, their voter registration programs. For these reasons, and those stated below, Plaintiffs request that the Court declare that the Secretary's wet signature rule violates the First and Fourteenth Amendments to the U.S. Constitution, Section 1971 of the Civil Rights Act of 1964, and the Texas Election Code; enjoin the Secretary from enforcing the wet signature rule; and instruct the Secretary to inform all county registrars that voter registration applications should not be rejected for lack of a wet signature.

## JURISDICTION AND VENUE

5.        Plaintiffs bring this action under 52 U.S.C. § 10101 and 42 U.S.C. §§ 1983 and 1988 to redress the deprivation, under color of state law, of rights secured by the Civil Rights Act and the United States Constitution. This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States. This Court has supplemental jurisdiction over the matters that arise under state law pursuant to 28 U.S.C. § 1367 because those matters are so related to claims in the action within the Court's original jurisdiction that they form part of the same case

or controversy. This Court has personal jurisdiction over the Defendant who is sued in her official capacity only.

6.      Venue is proper in the U.S. District Court for the Western District of Texas pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events that gave rise to Plaintiffs' claim occurred there.

7.      This Court has the authority to enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## PARTIES

8.      Plaintiff Texas Democratic Party ("TDP") is the statewide organization representing Democratic candidates and voters throughout the State of Texas within the meaning of section 171 of Texas's Election Code and all other applicable provisions of the election laws. TDP's purpose is to elect Democratic Party candidates to public office throughout Texas. To accomplish its purpose, TDP engages in vitally important activities, including supporting Democratic Party candidates in national, state, and local elections through fundraising and organizing; protecting the legal rights of voters; and ensuring that all voters have a meaningful opportunity to cast ballots in Texas. TDP has millions of members and constituents from across the State, including Texans who regularly support candidates affiliated with the Democratic Party, and will register to vote in upcoming elections. County election officials in Texas follow the Secretary's directives regarding election law, and her directives and opinions are enforceable.

9.      In preparation for the 2020 elections, TDP has invested significant resources in voter engagement efforts with the goal of registering approximately 2,600,000 unregistered, eligible, Democratic voters. In support of this mission, TDP initiated a comprehensive organizing campaign that includes sending voter registration forms to new and unregistered Texas residents,

following up with residents to encourage the completion and submission of voter registration forms, and partnering with organizations involved in high school and college campus organizing. TDP also relies on an online registration tool that allows voters to enter their application information and automatically populates their voter registration form. But because the wet signature rule prevents voters from signing their voter registration forms electronically or with an imaged signature, TDP must expend additional resources to ensure that voters receive and sign a hard copy of their completed applications, and, in many cases, deliver stamped, addressed envelopes which voters can use to mail their applications to their county registrars.

10.     Defendant's conduct directly harms TDP by imposing burdens and costs that limit the effectiveness of its voter registration program and make it more difficult for TDP to reach its registration goals and accomplish its mission of electing Democrats in Texas. Because of the wet signature rule, TDP will be forced to expend more resources, and divert funds from other critical priorities, in order to assist voters in completing the registration process and increase turnout. For example, as part of its vigorous registration program, TDP will deploy 1000 field staff and canvassers across the State, mail unregistered eligible voters a voter registration card, chase voter registration forms sent to eligible voters, and work alongside other Democratic organizations to ensure that voters return their applications to county registrars, all to advance TDP's goal of largescale voter registration. The wet signature rule also burdens and violates the constitutional and statutory rights of TDP members and constituents who are required to register in order to vote in the upcoming 2020 elections, and some of whom have had their voter registration applications

with imaged signatures rejected, and must now incur the additional burden and expense of complying with the wet signature rule.

11.     Plaintiff DSCC is the national senatorial committee of the Democratic Party, as defined by 52 U.S.C. § 30101(14), and its mission is to elect candidates of the Democratic Party to the United States Senate, including in Texas. DSCC works to accomplish its mission across the country and in Texas by, among other things, assisting state parties. In 2018, DSCC made contributions and expenditures in the tens of millions of dollars to persuade and mobilize voters to support Democratic Senate candidates. In 2020, DSCC expects to invest millions in support of the Democratic candidate selected as the nominee to run against Republican Senator John Cornyn. The Secretary's conduct directly harms DSCC by frustrating its mission of, and efforts in, electing the Democratic Party candidate to the U.S. Senate in Texas by suppressing the access of eligible Texas citizens to the franchise. DSCC is aware of Texas's unlawful restrictions on voter registration application signatures, and will have to expend and divert additional funds and resources to ensure that eligible citizens are registered to vote in order to support its mission, at the expense of its other voter persuasion activities in Texas, as well as its efforts in other states. The wet signature rule also harms DSCC's constituents who are required to register in order to vote in the upcoming 2020 elections, and some of whom have had their voter registration applications with imaged signatures rejected in the past, and must now incur the additional burden and expense of complying with the wet signature rule.

12.     Plaintiff DCCC is the national congressional committee of the Democratic Party, as defined by 52 U.S.C. § 30101(14). DCCC's mission is to elect Democratic candidates to the U.S. House of Representatives from congressional districts across the United States, including from Texas's 36 congressional districts. In 2018, DCCC made contributions and expenditures in

the tens of millions of dollars to persuade and mobilize voters to support Democratic congressional

candidates—several million dollars of which were spent in Texas. For 2020, DCCC has identified

at least eight congressional districts in Texas (Congressional Districts 7, 10, 21, 22, 23, 24, 31, and

32) as targeted races, in which it will expend resources to support the Democratic candidate,

including specifically through expenditures on voter registration efforts. Overall, in 2020, DCCC

expects to make contributions and expenditures in the millions of dollars to persuade and mobilize

voters to support Democratic candidates in congressional elections around the country, including

in Texas.

13.     In support of its mission, DCCC is currently engaged in a campaign to boost voter

turnout, which includes a canvassing program to expand registration in Texas. To date, DCCC has

spent over $250,000 and has committed to spend over $350,000 to increase voter registration

among eligible Texans by, among other things, recruiting and training volunteer deputy registrars,

collecting valid and completed voter registration applications, and submitting completed

applications to the appropriate county registrars. In addition, DCCC recently engaged a consultant,

at a cost of nearly $400,000, to provide voter registration services in Texas Congressional District

23. And DCCC intends to participate in the "coordinated campaign," which is a collaboration

between the national party and the TDP to elect Democrats up and down the ticket. In advance of

the 2020 election, in connection with this "coordinated campaign," DCCC will need to give

significant sums to the TDP to spend on its field program, which includes voter registration efforts.

DCCC also relies on online tools, like IWillVote.com, to collect voter information to assist voters

in completing registration applications. But Texas's wet signature rule limits the reach of DCCC's

campaign: without the wet signature rule, DCCC would be able to print out and submit applications

completed online and signed electronically, which would allow DCCC to facilitate the registration

of many more voters throughout the State. However, under the wet signature rule, DCCC and its partners will be required to collect and mail hand-signed application forms from voters, or assist voters in submitting the hand-signed forms directly to county registrars.

14.     Defendant's conduct directly harms DCCC by limiting the effectiveness of its voter registration campaign and canvassing efforts and frustrates DCCC's efforts to elect Democratic Party candidates from Texas to the U.S. Congress. Because of the wet signature rule, DCCC will be forced to expend more resources, and divert funds from other critical priorities as well as its programs in other states, in order to accomplish its goal of significantly increasing voter registration and turnout in Texas. The wet signature rule also harms DCCC's constituents who are required to register in order to vote in the upcoming 2020 elections, and some of whom have had their voter registration applications with imaged signatures rejected in the past, and must now incur the additional burden and expense of complying with the wet signature rule.

15.     Defendant, RUTH R. HUGHS, is the Secretary of State of Texas and is sued in her official capacity. She is Texas's chief election officer and is charged with administering the Texas Election Code. The Secretary is also charged with maintaining "uniformity in the application, operation, and interpretation of" the Texas Election Code. TEX. ELEC. CODE § 31.003. "In performing this duty, the Secretary shall prepare detailed and comprehensive written directives and instructions relating to and based on" the Election Code and "distribute these materials to the appropriate state and local authorities having duties in the administration of these laws." *Id*. The Secretary also assists and advises "all election authorities with regard to the application, operation, and interpretation of" the Texas Election Code, *id.* § 31.004(a), and is responsible for "implement[ing] and maintain[ing] a statewide computerized voter registration list that serves as

the single system for storing and managing the official list of registered voters in the state." *Id.* §

18.061.

## GENERAL ALLEGATIONS

16.      Texas law provides several avenues through which eligible citizens may submit

their voter registration applications to their county registrar: by personal delivery, by mail, or by

fax. TEX. ELEC. CODE § 13.002(a). None of these options require a wet signature on the registration

application. And although a voter who chooses to register by fax must also mail the application to

their county registrar, Texas law requires only that they mail a "copy" of the application. *Id.*

§ 13.143(d-2).

17.      In 2018, an organization seeking to increase voter turnout in Texas deployed a

smartphone application ("app") to assist voters in completing their registration forms, just as it had

done successfully in Alaska, Colorado, District of Columbia, Kansas, and South Carolina. *See*

Debra Cleaver, *We Found a Way to Increase Voter Turnout in Texas, but Texas Isn't Interested*,

Medium (Oct. 4, 2018), https://medium.com/s/story/texas-rejected-1000s-of-legally-submitted-

voter-registration-forms-days-before-the-deadline-d4dbc7fa8504. The app allowed applicants to

provide information through their smartphones that would auto-populate into a paper voter

registration form. The voters would then sign their name on a piece of paper, take a picture of the

signature, and upload it to the app. Once the organization received the uploaded information, it

affixed the voters' signatures to the application form and faxed and mailed a copy of the application

to the county registrar in accordance with Texas law. Using the app, thousands of Texans were

able to quickly and seamlessly complete their voter registration applications.

18.      Between late September and early October 2018, more than 2,400 voters in Texas

used the smartphone app to complete their voter registration applications. Then, five days before

the registration deadline, former Texas Secretary of State Rolando Pablos indicated that the 2,400

applications were invalid because, according to the Secretary, every registration requires an

original, wet signature. Press Release, Texas Secretary of State, Secretary Pablos Reminds Texans

To Exercise Caution When Registering To Vote (Oct. 4, 2018) (available at

https://www.sos.texas.gov/about/newsreleases/2018/100418.shtml). And a spokesperson for the

Secretary went as far as to declare the use of the smartphone app to submit voter registration

applications "illegal." James Barragan, *Thousands of Texas voter registration applications filed*

*using online tool could be invalid*, The Dallas Morning News (Oct. 4, 2018),

https://www.dallasnews.com/news/politics/2018/10/04/thousands-of-texas-voter-registration-

applications-filed-using-online-tool-could-be-invalid/.

19.     The Secretary's announcement created confusion among county voter registrars

and voters who were forced to reconcile the inherent conflict between the registration laws and the

new-found wet signature rule. For instance, the day after the Secretary announced the wet signature

rule, Bruce Elfant, the Travis County registrar, said that he would process and accept registration

applications without wet signatures despite the Secretary's announcement. According to Elfant's

legal counsel, state law allows for copies of voter registration forms to be submitted without wet

signatures. The next day, Elfant reversed course and claimed that between 400 and 500

applications submitted without a wet signature would be rejected. He also acknowledged that not

all affected voters would be able to re-submit their applications and register before the deadline.

20.      Other counties followed the Secretary's guidance, and it is anyone's guess how the

county registrars determined whether an application complied with the wet signature rule. Neither

Texas law nor the Secretary's interpretation sets forth any standards that would inform a registrar's

signature analysis, and the Secretary has admitted that election officials are not expected to, and

typically do not, analyze or compare wet signatures. *Stringer v. Pablos*, 320 F. Supp. 3d 862, 874 (W.D. Tex. 2018), *rev'd and remanded sub nom. Stringer v. Whitley*, 942 F.3d 715 (5th Cir. 2019). Absent any guidelines for distinguishing between wet and imaged signatures, enforcement of the wet signature rule will be left entirely to election officials' unfettered discretion and will inevitably result in the arbitrary deprivation of the right to vote.

21.     The Secretary's decision to impose this rule, moreover, is unsupported by existing state statutes governing voter registration, and it also contradicts well-established federal and state laws that recognize the validity of electronic or other non-ink signatures. For example, if a person completes a voter registration application at the Department of Public Safety (DPS), DPS must "inform the applicant that the applicant's electronic signature provided to the department will be used for submitting the applicant's voter registration application." TEX. ELEC. CODE § 20.066. The Texas Administrative Code also authorizes election officials to capture voters' signatures using electronic devices for Election Day signature rosters, 1 TEX. ADMIN. CODE § 81.58(a), and the Code specifically defines "electronic signature" as "a digitized image of a handwritten signature." *Id*. at § 81.58(b). The Texas Business & Commerce Code recognizes that a signature "may not be denied legal effect . . . solely because it is in electronic form" and expressly states that "[i]f a law requires a signature, an electronic signature satisfies the law." TEX. BUS. & COM. CODE § 322.007(a),(d).

22.     In an ongoing lawsuit involving the State's voter registration procedures, a federal court has found that the Secretary has "no authority for the proposition that [applications must contain] a physical ink signature written on paper by hand" to comply with Texas election laws, and confirmed that "there is nothing in Texas law that precludes the use of electronic records and electronic signatures." *Pablos*, 320 F. Supp. 3d at 895-96. On the contrary, Texas law "permits

[the Secretary] . . . to accept electronic records and electronic signatures," and "[t]here is no legal impediment to using electronic signatures." *Id.* at 896-97, 899. Furthermore, the Secretary has already acknowledged that "electronic signatures comply with signature requirements under" the Texas Election Code and has also admitted that the State does not use or rely on the signatures for any registration-related purpose. *Id*. at 873-74, 895, 899. Despite this, Texas's practices remain the same. Order Granting In Part Prelim. Inj. at 10 n.7, *Stringer v. Pablos*, No. SA-16-CV-257-OG (Jan. 30, 2020) (ECF No. 156).

23.    The Secretary's wet signature rule is also inconsistent with Texas's election administration procedures, as the Texas Department of Public Safety (DPS) uses a system, similar to the smartphone app, that creates voter registration applications using electronically captured signatures. *Pablos*, 320 F. Supp. 3d at 874. When applicants interact with DPS—whether by applying or renewing a driver's license or changing their address—they complete the relevant DPS forms and sign an electronic keypad. The electronic keypad is just that: it is not a physical, paper form but is instead a separate electronic device with a space for an applicant to sign. DPS then captures and electronically stores the signatures entered into the keypad. For purposes of voter registration, DPS reviews its own forms and selects information relevant to voter registration and then combines this information with the electronically-stored signatures to create a separate voter registration application to be sent to the Secretary. DPS then electronically transmits the applicants' signatures with the necessary information to the Secretary to allow the Secretary to register the applicants to vote. *Id*. at 872-73. The applicants do not review or complete this voter registration application, nor do they ever physically sign the application form. *Id*. And DPS has acknowledged that the information it transmits to the Secretary includes only a "digital image" of

the applicant's signature taken from DPS forms. *Stringer v. Pablos*, No. 5:16-cv-00257-OLG, ECF 77-1 at 42, 120.

24.     These practices highlight the unlawfulness and inconsistency of the Secretary's wet signature rule, which is compounded by the fact that there is no official guidance that would inform an election official's analysis of a voter registration application to distinguish between wet-ink and imaged signatures. *Pablos*, 320 F. Supp. 3d at 873.

25.     In all, Texas election officials unlawfully rejected applications from eligible voters, many of whom were unable to re-submit their applications in time to vote. As the Secretary and county officials continue to enforce the wet signature rule, many more voters will be denied the opportunity to register. Plaintiffs, as a result, will be forced to continue to divert and expend additional resources toward their mission to increase voter registration and turnout, while curtailing the scope of direct assistance they can provide to Texans during the registration process, all of which hinders Plaintiffs' ability to accomplish their missions.

## CLAIMS FOR RELIEF

### COUNT I
### Section 1971 of the Civil Rights Act of 1964
### 52 U.S.C. § 10101(a)(2)(B), 42 U.S.C. § 1983

26.     Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

27.     Section 1971 of the Civil Rights Act of 1964, 52 U.S.C. § 10101(a)(2)(B), provides that:

> No person acting under color of law shall . . . deny the right of any
> individual to vote in any election because of an error or omission on
> any record or paper relating to any application, registration, or other
> act requisite to voting, if such error or omission is not material in

determining whether such individual is qualified under State law to
vote in such election

28.     Texas's wet signature rule is immaterial to determining whether an elector is qualified to vote in Texas. In another lawsuit involving Texas's voter registration procedures, the Secretary admitted that election officials are not expected to analyze or compare wet signatures, and that "electronic signatures comply with signature requirements under the . . . Texas Election Code." *Pablos*, 320 F. Supp. 3d at 899. The Secretary has also admitted that the State does not use the wet ink signatures that appear on the applications for any voter registration purpose. *Id*. And Texas expressly permits election officials to collect electronic signatures for Election Day signature rosters. 1 TEX. ADMIN. CODE § 81.58.

29.     As a result of the wet signature rule, election officials arbitrarily rejected, and will continue to reject, voter registration applications from otherwise eligible Texas electors, thereby denying these citizens their fundamental right to vote.

30.     Based on the foregoing, Defendant, acting under color of state law, has deprived and will continue to deprive Texans, including Plaintiffs' members and constituents, of the rights secured to them by Section 1971 of the Civil Rights Act of 1964, 52 § 10101(a)(2)(B).

## COUNT II
### Equal Protection
### (arbitrary rejection of registration applications and disparate treatment)
### U.S. Const. Amend. XIV, 42 U.S.C. § 1983

31.     Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

32.     The wet signature rule imposes an unnecessary, ill-defined restriction on the registration process that subjects the right to vote of thousands of eligible Texans to arbitrary enforcement. Because election officials are not required or even expected to analyze applications

for the purpose of distinguishing between wet-ink and imaged signatures, there are no guidelines

that inform an election official's determination that a signature does not satisfy the wet-ink rule.

33.     The Equal Protection Clause of the Fourteenth Amendment to the United States

Constitution prohibits states from "deny[ing] to any person within its jurisdiction the equal

protection of the laws." U.S. CONST. amend. XIV, § 1. This constitutional provision applies

equally to "the manner of [the] exercise [of voting]," such that "once granted the right to vote on

equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote

over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000).

34.     The wet signature rule inevitably results in the arbitrary denial of voter registration

applications, and by extension the right to vote, and subjects voters to differential treatment based

upon the method by which they signed their applications. The continued enforcement of this rule

directly harms Plaintiffs' mission to increase turnout and elect Democratic representatives and

disenfranchises those among Plaintiffs' constituents whose applications are rejected for nothing

more than the perceived absence of a wet-ink signature.

**COUNT III**
**Equal Protection (unconstitutional burden on the right to vote)**
**U.S. Const. Amend. XIV, 42 U.S.C. § 1983**

35.     Plaintiffs reallege and reincorporate by reference all prior paragraphs of this

Complaint and the paragraphs in the counts below as though fully set forth herein.

36.     Under the First Amendment and the Equal Protection Clause of the Fourteenth

Amendment, a state cannot utilize election practices that unduly burden the right to vote. To

determine whether a state law imposes an undue burden on the right to vote in violation of the

Fourteenth Amendment, federal courts apply the *Anderson-Burdick* balancing test, which

"weigh[s] 'the character and magnitude of the asserted injury to the rights . . . that the plaintiff

seeks to vindicate' against 'the precise interests put forward by the State as justifications for the

burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

37.     By interpreting Texas election laws to impose a wet signature rule, the Secretary's guidance to election officials imposes an undue burden on the right to vote by causing the rejection of voter registration applications from eligible voters, many of whom would not otherwise have the opportunity to register in time to exercise their right to vote in an upcoming election.

38.     And to the extent that TEX. ELEC. CODE §§ 13.002(a) and 13.143 (d-2) impose a wet signature rule, these laws violate the First and Fourteenth Amendments by imposing undue burdens on the right to vote.

39.     The wet signature rule, moreover, cannot be justified by any legitimate State interest. Indeed, the Western District of Texas recently acknowledged that Texas statutes recognize electronic signatures as legally binding. *Pablos*, 320 F. Supp. 3d at 895-96. And election officials are not expected to, and typically do not, analyze or compare signatures on voter registration applications. *See id*. at 874. The rejection of signatures that do not appear to have been entered by wet ink is therefore unrelated to any fraud prevention rationale, and simply results in the arbitrary rejection of valid applications from eligible voters.

40.     Because the wet signature rule unduly burdens the rights of eligible voters to register and vote, and is not outweighed by any countervailing state interest, it violates the First and Fourteenth Amendments to the U.S. Constitution.

**COUNT IV**
**Due Process Violation**
**U.S. Const. Amend. XIV, 42 U.S.C. § 1983**

41.     Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

42.     The Due Process clause of the Fourteenth Amendment "affords protection against the disenfranchisement of a state electorate in violation of state election law." *Duncan v. Poythress*, 657 F.2d 691, 708 (5th Cir. 1981); *see also Bonas v. Town of N. Smithfield*, 265 F.3d 69, 75 (1st Cir. 2001). The Constitution affords the states broad power to regulate the conduct of federal and state elections, but "the federal courts have not hesitated to interfere when state actions have jeopardized the integrity of the electoral process" because "an officially-sponsored election procedure . . . [is], in its basic aspect, . . . flawed." *Duncan*, 657 F.2d at 702-03.

43.     The wet signature rule jeopardizes the integrity of the electoral process in Texas by denying Texans the right to register and vote in accordance with state law. Texas law allows voters to submit "copies" of their voter registration applications in lieu of the originals; the Secretary has admitted that it uses "previously imaged electronic signatures" from driver's license renewals and address changes for the purposes of voter registration; the State does not use the physical, wet-ink signatures on application forms for any voter registration purpose; and the Secretary has admitted that "electronic signatures comply with signature requirements under the . . . Texas Election Code." *Pablos*, 320 F. Supp. 3d at 899; *see also* TEX. ELEC. CODE §§ 13.002(a), 13.143(d-2).

44.     Despite these admissions, and the absence of any language in the Texas Election Code that prohibits electronic or imaged signatures, the Secretary imposed a wet signature rule

that denied—and will continue to deny—qualified voters both the right to register as guaranteed to them under State law, and the right to vote.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment:

        a)      declaring that the wet signature rule violates "Section 1971" of the Civil Rights Act of 1964, 52 U.S.C. § 10101(a)(2)(B);

        b)      declaring that the wet signature rule violates the First and Fourteenth Amendments to the U.S. Constitution;

        c)      declaring that the wet signature requirement violates the Due Process Clause of the Fourteenth Amendment;

        d)      preliminarily and permanently enjoining the Secretary, her respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, including all county voter registrars, from implementing, enforcing, or giving any effect to the wet signature rule;

        e)      preliminarily and permanently enjoining Defendant from rejecting voter registration applications for lack of a wet-ink signature;

        f)      requiring Defendant to permit voters whose voter registration applications were previously rejected for lack of a wet signature to resubmit their applications;

        g)      awarding Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and other applicable laws;

        h)      granting such other and further relief as the Court deems just and proper.

Dated this 23rd day of July, 2020.

Respectfully submitted,

/s/ *Skyler M. Howton*
Skyler M. Howton, TX# 24077907
PERKINS COIE LLP
500 North Akard St., Suite 3300
Dallas, TX 75201-3347
Telephone: (214) 965-7700
Facsimile: (214) 965-7799
showton@perkinscoie.com

Marc E. Elias*
Uzoma Nkwonta*
Emily Brailey*
Stephanie Command*
PERKINS COIE LLP
700 Thirteenth St., N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-9959
melias@perkinscoie.com
unkwonta@perkinscoie.com
ebrailey@perkinscoie.com
scommand@perkinscoie.com

*Counsel for the Plaintiffs*
*\* Admitted pro hac vice*

Chad W. Dunn
TX State Bar No. 24036507
Brazil & Dunn, LLP
4407 Bee Caves Road, Suite 111
Austin, Texas 78746
Telephone: (512) 717-9822
Facsimile: (512) 515-9355
chad@brazilanddunn.com

Robert Leslie Meyerhoff
Texas Democratic Party
314 E. Highland Mall Blvd. #508
Austin, TX 78752
Telephone: 512-478-9800
rmeyerhoff@txdemocrats.org

*Counsel for Plaintiff Texas Democratic Party*

## CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2020, I filed a copy of the foregoing document on behalf of Texas Democratic Party, DSCC, and DCCC with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

 /s/ *Skyler M. Howton*
Counsel for Plaintiffs